### THE POCAHONTAS.

### EAGLE TRANSPORT CO., Limited, et al. v. UNITED STATES.

District Court, S. D. New York.
June 12, 1939.

Kirlin, Campbell, Hickox, Keating & McGrann, of New York City (Robert S. Erskine, of New York City, of counsel), for libellants.

Lamar Hardy, U. S. Atty., of New York City (Charles E. Wythe, Sp. Asst. to Atty. Gen., of counsel), for respondent.

COXE, District Judge.

These are exceptions by the libellants to so much of a report of a commissioner as disallows various items of damage claimed by the libellants. The suit is for damages sustained by the libellants' tank steamship San Tirso in a collision with the respondent's steamship Pocahontas, which occurred at the entrance to New York Harbor on Dec. 14, 1917. The trial judge held the Pocahontas solely at fault, and referred the case to a commissioner to assess the damages. The commissioner made a substantial award to the libellants. He refused, however, to allow anything for the detention of the San Tirso during a period of 57 days ¾ hr. while she was laid up in London undergoing repairs. He also disallowed various items for drydocking and incidental expenses necessitated by the lay-up. These rejected items are the only ones challenged by the exceptions.

The collision took place in a winter storm while the two vessels were riding at anchor outside of New York Harbor. The Pocahontas dragged her anchor and fell down on the San Tirso, twisting the latter's stem and causing substantial damage. The captain and pilot of the Pocahontas testified, and the trial judge found, that the anchor chains of the Pocahontas ran underneath the bow end of the San Tirso.

At the time of the collision the San Tirso was loaded with oil, and in readiness to proceed home to London. She was surveyed afloat by Lloyd's surveyor, who concluded that she might complete the voyage with temporary repairs. He recommended, however, that permanent repairs be made at the "first convenient opportunity". The owner's New York agent thereupon cabled a brief report of the collision to the owner at London, but made no mention of any underwater damage to the vessel. Upon receipt of this cable, the owner "stemmed" a drydock at London, which, in the existing war time conditions, could only be reserved in advance. The reservation of the drydock was, however, prompted solely by the cable advice from New York regarding the collision.

The San Tirso, after effecting temporary repairs at New York, set out for London, and on the voyage home encountered very heavy weather, which seriously damaged the vessel and made further extensive repairs necessary. The commissioner found on ample evidence that these heavy weather damage repairs "were sufficient in themselves to require the lay-up".

The drydock was not immediately available when the vessel reached London, and, after discharging her cargo, she went into drydock on Jan. 14, 1918, where a survey was commenced afloat and repairs were started. On Jan. 31, 1918, the vessel moved to drydock, and remained there continuously until March 1, 1918, when she went off drydock. The remaining repairs were made afloat, the whole work being completed on March 9, 1918. The entire period of the lay-up was 57 days ¾ hr.

The San Tirso was on a long term charter providing for charter hire of £90: 4:7 a day, and the detention damages claimed have been computed at that rate for the entire detention period. The remaining disputed items are for a portion of the drydock expenses, and for the incidental disbursements in connection with the lay-up. The total bill for drydocking was £1245:6:0 for the full 29 days the vessel was in drydock, but inasmuch as the collision repairs required the use of the dock for only 10 of these 29 days, the libellants have limited their claim for the drydock expenses to a proportionate part of the entire drydocking charge, or £504:15:6.

The owner of the San Tirso learned of the riding of the Pocahontas' anchor chains by the San Tirso after the vessel arrived in London, and before the survey. When the vessel was placed in drydock serious damage to the port bilge keel was discovered, which the commissioner found was due to the collision. He held that even if there had been no heavy weather damage at all, the owner would still have been justified in drydocking the vessel for collision damage alone. He thought though that the prior stemming of the drydock by the owner "was in the nature of a precautionary measure", and "did not evidence a decision then and there to drydock the vessel for collision damage". He concluded, therefore, that "the decision to lay up the vessel was not reached until the vessel's

arrival at London, at which time the heavy weather damage had been sustained".

The repairs for both the collision damage and the heavy weather damage were made concurrently. It is not clear, however, from the report whether the whole period of the lay-up was required for each of the two classes of repairs. The finding is merely that the heavy weather damage was sufficient in itself to account "for all of the time the vessel was at the yard under repair", and inasmuch as the commissioner concluded that no recovery could be had for the items now in dispute, he apparently deemed it unnecessary to make any finding as to the time required for the collision repairs.

The evidence on this branch of the case is conflicting, but I am satisfied from a careful reading of the record that it supports the contention of the libellants that the whole period of the lay-up was required for either class of repairs. The witnesses for the libellants testified to that effect, and the only testimony to the contrary came from White, the respondent's surveyor, who was of the opinion that four weeks would have been ample for the collision repairs. White was then contending that there was no underwater collision damage. The commissioner, however, found squarely against this contention, and in doing so destroyed the very premise on which the four weeks' estimate was based. White also asserted that there was a cessation of collision repairs for about two weeks. This was denied by the libellants' witnesses, who testified that the only delay was for a few days when the repair yard was waiting for needed materials. I am inclined to credit this latter testimony, as it seems entirely likely that there would have been some difficulty in obtaining materials during the wartime period. I doubt though whether there was any considerable delay from that cause. In any event, I am satisfied that, whatever the delay, it was unavoidable, and would have been incurred irrespective of the repairs for the heavy weather damage.

The question then is presented whether the libellants may recover detention damages and lay-up expenses in view of the fact that the vessel, subsequent to the collision, sustained heavy weather damage, which in itself would have been sufficient to require drydocking and lay up for repairs for the full detention period.

First, as to detention damages. The general rule is that the owner of a vessel damaged in a collision may recover for the loss of her use while laid up for repairs. The Potomac, 105 U.S. 630, 26 L. Ed. 1194; The Conqueror, 166 U.S. 110, 17 S.Ct. 510, 41 L.Ed. 937. There is no particular difficulty in applying this rule where collision damages alone are involved. The question, however, becomes troublesome when collision and owner's repairs are made concurrently; it is then necessary for the libellant to show that the detention damages are the proximate result of the collision. Thus, if prior to the collision, the owner has determined to lay up the vessel for overhauling, or if a periodic survey is then due, he is not entitled to detention damages from the colliding vessel. The Astrakhan, L.R. (1910), Prob.Div. 172; Clyde S. S. Co. v. City of New York, 2 Cir., 20 F.2d 381. The same is true where collision repairs are not immediately necessary but the owner seizes the opportunity to make collision repairs as well as owner's repairs concurrently. Pan-American Petroleum & Transport Co. v. United States, 2 Cir., 27 F.2d 684.

If, on the other hand, collision repairs are immediately necessary, and the owner uses the occasion to make owner's repairs concurrently with collision repairs, he may still recover damages for the full period of the detention, provided the owner's repairs do not extend the time required for the collision repairs. Clyde S. S. Co. v. City of New York, supra; Pan-American Petroleum & Transport Co. v. United States, supra; Hines v. Sangstad S. S. Co., 1 Cir., 266 F. 502; The Ruabon, L. R. (1900) App.Cas. 6; The Acanthus, L.R. (1902) Prob.Div. 17; The Chekiang, L.R. (1926) App.Cas. 637. The test for determining whether the collision repairs are immediately necessary is "the objective standard of a reasonable person". Pan-American Petroleum & Transport Co. v. United States, supra.

In the present case the decision of the owner to lay up the vessel for collision repairs was fully justified; this decision was shown not only to have been reasonable when made, but to have been "well founded". Pan-American Petroleum & Transport Co. v. United States, supra, 27 F.2d page 685. The commissioner has in effect so found, even though he thought that the decision to lay up the vessel was

not reached until she arrived at London. I do not believe that it is of any great consequence just when the owner acted, so long as he acted promptly upon adequate information. Here, the stemming of the drydock was at least a tentative decision to lay up the vessel, and when the full facts relating to the collision were available, the necessity for the lay-up for collision repairs became apparent. I think, therefore, that the libellants have sustained the burden of showing that the collision was the proximate cause of the lay-up.

 Does the fact that the heavy weather damage also necessitated the lay-up bar a recovery? I think not. This heavy weather damage occurred subsequent to the collision, and after the liability of the respondent had attached; it cannot be said, therefore, to have been the proximate cause of the lay-up. Much the same question was raised in The Haversham Grange, L.R. (1905) Prob.Div. 307, in which the libellant's vessel was first damaged in a collision with the Caravellas, and the next day again damaged in a second collision with The Haversham Grange. The repairs for both collisions were made concurrently, those required for the first necessitating a detention of 23 days, and those for the second a detention of 6 days. The court held that the entire detention loss was chargeable against the Caravellas, which was the vessel first in collision. The commissioner sought to distinguish this case on the ground that it involved successive torts. I do not think that this distinction is at all tenable. The real basis of the decision was that the first collision was the proximate cause of the detention. That is the determining issue in the present case, and inasmuch as it has been found that the collision with the Pocahontas was the proximate cause of the detention, it follows that the libellants are entitled to detention damages from that vessel.

Second, as to the drydock and incidental expenses. These expenses are all covered by vouchers, and represent actual disbursements in connection with the lay-up. They would have been incurred for either class of repairs, and should logically follow the detention damages. This was the ruling in The Super X, D.C., 15 F. Supp. 294, and it seems also to have been decided in Navigazione Libera T. S. A. v. Newtown Creek T. Co., 2 Cir., 98 F.2d 694. The English rule for the apportionment of such expenses, as found in The Haversham Grange, L.R. (1905) Prob.Div. 307, has not been followed by the American authorities; it was indeed seriously questioned in one of the opinions in The Chekiang, L.R. (1926) App.Cas. 637. I think, therefore, that the libellants may recover these drydocking and incidental expenses as collision damages.

The exceptions of the libellants to the commissioner's report are sustained, the report modified to include the damages for detention, and the drydocking and incidental expenses of the lay-up and the report as so modified confirmed. The compensation of the commissioner will be fixed in the order of confirmation.