The ATLANTIC REFINING COMPANY, Owner of THE ATLANTIC TRADER,

v.

MATSON NAVIGATION COMPANY, a corporation

and

THE HAWAIIAN RETAILER, her engines, etc.

No. 301 of 1952.

United States District Court
E. D. Pennsylvania.

April 8, 1957.

Otto Wolff, Jr., Philadelphia, Pa., for plaintiff.

Springer H. Moore, Jr. (of. Krusen, Evans & Shaw), Philadelphia, Pa., Haight, Gardner, Poor & Havens, New York City, for defendant.

GRIM, District Judge.

The Atlantic Trader, a ship belonging to the libellant, suffered two misfortunes. The first of these was the fouling of her propeller and tailshaft on a buoy anchor chain on December 16, 1950. A survey showed that the damage done did not render the ship unseaworthy but recommended that repairs be made at the vessel's next drydocking. This was scheduled for March 14, 1951.

The ship's second misfortune was her grounding on January 29, 1951, in the Delaware River, being crowded in the Chester range by respondent's ship Hawaiian Retailer. This caused damage to the Atlantic Trader's bottom which rendered her unseaworthy.[1] She dis-

---

1. Meaning not in proper condition to make a sea voyage.

charged her cargo at its destination in Philadelphia the next day. Instead of sailing on her next scheduled voyage to Areco, Texas, to load cargo, she sailed without cargo on January 30, 1951, to Mobile, Alabama, for drydocking, arriving at that port on February 5, 1951.

In drydock the damage caused by the grounding was repaired at a cost of $54,391.22. In addition, and without interfering with the bottom repairs or extending the drydocking time, the damage caused by the December 16th fouling was repaired and the ship received maintenance repairs, its general overhaul, and the annual hull, boiler and machinery classification surveys previously scheduled for the March 14th drydocking.

The cost of drydocking the ship, whether to repair the grounding damages on one hand, or the fouling damages plus the overhaul and surveys on the other, was $18,459.07. Doing both simultaneously did not increase or decrease this cost or the time required.

Libellant and respondent have agreed to settle this suit for 75 per cent of libellant's "provable damages suffered by it as the result of the grounding * * *." The parties being unable to agree on the amount of the damages, a commissioner was appointed to ascertain and compute it.

In his report the commissioner recommended a decree against the respondent for 75 per cent of the $54,391.22, but he denied recovery for the drydocking cost of $18,459.07 or any part thereof.

The matter is before me on libellant's exceptions to so much of the commissioner's report as disallows the claim in respect of the $18,459.07.

Libellant claims that it is entitled to the drydocking cost because respondent's marine tort rendered the drydocking immediately necessary. Respondent denies liability on the ground that the effect of its conduct was merely to advance the date of an already scheduled drydocking about a month and a half.

This is a tort problem, and the rule in tort is that the tortfeasor is liable for all the damages which are the proximate result of its tortious act. Absent any factor to relieve respondent of liability therefor, it would follow that respondent is liable for the drydocking cost, since the damages to the bottom could not be repaired without drydocking.

It may appear at first blush that to award this libellant the cost of putting its ship in drydock gives it a windfall by enabling it to avoid the drydocking cost that it would have had to bear and planned to bear, in any event, a month and a half later. To deny it the drydocking cost, on the other hand, would be to grant the respondent a windfall, relieving it of an item of damages because of the wholly fortuitous factor of the time of the periodic overhaul and surveys of the vessel which suffered the tort. The timing of the overhaul and surveys has no relation to the damage inflicted and I cannot see it as a factor which should mitigate the tortfeasor's damages. Periodic overhaul and surveys are required during the ship's existence, whether or not torts are committed against it.

An analogy to the facts of this case is the situation of the owner of an automobile who has arranged with a garage to have the engine overhauled on the tenth of the month in a manner which will require that the engine be taken apart. A week before that time, however, someone wrongfully collides with the car and causes damage that can be repaired only by taking the engine apart. While the engine is in pieces to make the repairs resulting from the collision, the previously planned overhaul is made. The owner, of course, remains liable for the work required in the overhaul, but the tortfeasor would be liable for the cost of disassembling the engine. Similarly of a person suffering chronic appendicitis, who, having arranged for an appendectomy a month hence, has his leg tortiously broken and is hospitalized. While there having his leg treated, and before the day previously arranged, he has his appendix removed. The previous appointment for the appendectomy in my

opinion would not relieve the tortfeasor of the cost of room and board in the hospital if the hospitalization is not extended by the appendectomy.

Respondent has cited cases in support of its contention that libellant here cannot recover the drydocking expenses: Clyde S. S. Co. v. City of New York, 2 Cir., 1927, 20 F.2d 381. The Pocahontas, 2 Cir., 1940, 109 F.2d 929. All the cases cited by respondent are distinguishable from the present case, however, in that in them the damages did not make the ships unseaworthy and the repairs to the ships were not necessary immediately after the accident, while in the present case the accident rendered the ship unseaworthy and the repairs immediately necessary.

In the case of The Pocahontas, supra, recovery was disallowed and the case involved a claim for detention (loss of profits) damage rather than drydocking damages, but in the court's opinion the law, which applies equally whether the claim is for detention damages or for drydocking costs, was stated very well as follows, at page 931:

"If the collision damage is serious enough to necessitate an immediate lay-up for repairs, the owner may charge the tort-feasor with what the vessel would actually have earned during the detention period; and there will be no abatement of the amount because the owner chooses the occasion to accelerate his annual overhaul or to repair damage for owner's account of a character not necessitating an immediate lay-up and not extending the detention period beyond the time required for collision repairs. Clyde S. S. Co. v. City of New York, 2 Cir., 20 F.2d 381, and cases therein cited. Even if the collision damage does not in fact require immediate repairs, the owner may in good faith and reasonably believe that it does;

and, in that event, he would be justified in sending her to dry-dock. See Pan-American Petroleum & Transport Co. v. United States, supra, [2 Cir.] 27 F.2d [684] at page 685. In such a case, if dry-docking discloses that the vessel is still seaworthy and if the owner nevertheless decided to proceed with permanent repairs rather than to return the vessel to service and postpone permanent repairs until the period of general overhaul, the question will arise whether detention damages will be for the owner's account or the tort-feasor's. It would seem that the answer should depend on what is reasonable conduct under all the circumstances and in the light of the rule that even a tort-feasor is entitled to the benefit of the principle of avoidable damages."

The rule would seem to be this: If as the result of a tort a ship sustains damage which renders it unseaworthy,[2] i. e. unfit for a sea voyage, the owner can recover from the tort-feasor the drydocking costs incurred while the repairs were being made, even though at the time the tort was committed a drydocking had been scheduled in the near future for other purposes. Since libellant's ship was made unseaworthy by the tort in the present case, and immediate drydocking was required, libellant is entitled to recover the cost of the drydocking.

It is interesting to refer to the case of The Bratsberg, D.C.E.D.Pa.1904, 127 F. 1005. In that case a ship was damaged as a result of a tort. Judge McPherson of this court, upon being confronted with a problem which was very similar to the problem in the present case, refused to create a windfall for either the owner or the tort-feasor and ordered that the docking expenses be divided between them. This seems like a very sensible solution

---

2. If there is doubt as to whether or not the damage has rendered the ship unseaworthy or made repairs necessary immediately, recovery for drydocking then will depend upon whether or not the owner's decision to make repairs immediately was reasonable under all the circumstances.

to the problem, but (and counsel for both sides agree to this) there seems to be little if any American authority to sustain Judge McPherson's decision. It is not clear in the Bratsberg case whether the tort made the ship unseaworthy and the repairs necessary immediately. Consequently, the case can hardly be used as an authority here.

Libellant's exceptions to the commissioner's report will be sustained. A decree may be submitted in accordance with this opinion entering judgment in favor of the libellant and against the respondent in the sum of 75 per cent of the cost of the repairs to the "Atlantic Trader" and also in the sum of 75 per cent of its drydocking cost.