244 F.2d 198
 MOORE-McCORMACK LINES, Inc., as charterer in possession of THE Steamship WILLIAM S. HALSTED, Libellant-Appellant,
v.
THE Tank Steamship ESSO CAMDEN, Standard Oil Company (N. J.), Claimant-Appellee.
 No. 148.
 Docket 24265.
 United States Court of Appeals Second Circuit.
 Argued January 22, 23, 1957.
 Decided April 11, 1957.
 
 COPYRIGHT MATERIAL OMITTED Burlingham, Hupper & Kennedy, New York City (Adrian J. O'Kane and Richard W. Palmer, New York City, of counsel, on the brief), for libellant-appellant.
 Kirlin, Campbell & Keating, New York City (Raymond T. Greene, Stephen J. Buckley and Ira A. Campbell, New York City, of counsel, on the brief), for claimant-appellee.
 Before CLARK, Chief Judge, and LUMBARD and WATERMAN, Circuit Judges.
 LUMBARD, Circuit Judge.
 
 
 1
 Cross appeals are taken by two ships from damages awarded resulting from a collision in 1946 for which both ships were held to be at fault. The questions raised concern the measure of reimbursement to both ships for losses from their respective detentions and for the outlay by libellant of general average disbursements.
 
 
 2
 On November 2, 1946, the S. S. William S. Halsted collided with the tank steamship Esso Camden in Chesapeake Bay. The Halsted, owned by Moore-McCormack Lines, Inc., had just commenced a voyage to ports on the Baltic Sea. The Camden, owned by Standard Oil Company (N. J.) (hereinafter "owner"), and under charter to its subsidiary, Standard Oil Company of New Jersey (hereinafter "charterer"), was enroute to Baltimore from Baytown, Texas. As a result of the collision, the Halsted was laid up for 17 days, after which she resumed her scheduled run to the Baltic. Upon her return, the season for Baltic trade being over, the Halsted turned to a South American cruise. The Camden, previously scheduled for a two-day layoff for repairs, was detained 15.986 days because of the collision.
 
 
 3
 The commissioner awarded the Halsted $20,342.28 detention damages for the 17 day delay, based on the average per diem profit of her collision and pre-collision voyages and $6,194.83, representing 2% commission and 6% interest on general average disbursements and 2½% settling agent's commission for collecting and settling the general average.
 
 
 4
 The Camden was awarded $22,181.29 detention damages. At the time of the collision, the Camden was carrying oil under a charter party between owner and charterer. The charter party having been prematurely terminated as a result of the collision, the commissioner looked to the potential earnings thereunder as a basis for ascertaining loss. Because of the accident the owner of the Camden was required to refund $38,395, representing a portion of the gross rate of hire which had been paid in advance by the charterer. This refund included profits and certain voyage maintenance expenses which it was agreed by stipulation would have been incurred by the owner. The commissioner therefore deducted $16,231.71, the stipulated voyage maintenance expenses, from the $38,395 refunded to the charterer in arriving at the $22,181.29 damages occasioned to the owner by the loss of use of the Camden. Nothing was allowed to the Camden for its maintenance expenses while laid up for repairs.
 
 
 5
 The commissioner's report was first affirmed in its entirety by the district court and later modified as to two minor items.[1]
 
 
 6
 The principal issue regarding the award to the Halsted concerns detention damages. In estimating the loss from the 17 day delay, the commissioner used an average of the per diem profits for the Halsted's collision and pre-collision voyages to the Baltic, $1,227.06 and $1,156.36 respectively, and ignored the post-collision voyages to South America which netted the Halsted only $413.25 daily profits. The Camden urges that the earnings of the post-collision voyage are the correct measure of the damages, or, at most, an average of the daily net earnings of the collision voyage and the post-collision voyage. Either of these measures would reduce the damages allowed by the commissioner.
 
 
 7
 It is well established that demurrage is recoverable only when profits have actually been, or may reasonably be supposed to have been lost, and such profits can be proven with reasonable certainty. The Conqueror, 1897, 166 U.S. 110, 125, 17 S.Ct. 510, 41 L.Ed. 937. Although the Halsted was able to complete successfully the interrupted voyage, she was active in a ready market at the time of the collision and for her loss of potential earnings she is entitled to reparation. The Mayflower, D.C.E.D.Mich. 1872, 16 Fed.Cas. page 1243, No. 9,345.
 
 
 8
 The only facts before us bearing on loss of profits from the detention are the stipulated earnings of the Halsted for three voyages: (1) the pre-collision Baltic voyage of 59 days showing a profit of $68,224.47, (2) the collision voyage to the Baltic for 78 days with $95,710.40 profit, and (3) the post-collision voyage to South American ports lasting 104 days and earning $42,978.06.
 
 
 9
 On consideration of all the circumstances, it seems to us that a fairer measure of lost profits is the average daily earnings over the entire period of the three voyages in evidence. The measure of a ship's demurrage is the amount the vessel would have earned in the business in which she has been customarily employed. Williamson v. Barrett, 1851, 13 How. 101, 54 U.S. 101, 110, 14 L.Ed. 68. The three voyages (not including the detention period) here cover a total of 241 days. This period is sufficient in point of time and activity to evaluate the Halsted's probable loss of profits from detention. For that matter, the Halsted's earnings over a longer period of time, or, perhaps earnings of similar ships in the same market at or about the period of detention, would also be relevant on the question of what was a fair measure of the Halsted's lost profits.[2] But no such proof was offered here. Under the circumstances of this case the average daily earnings during the 241 days is sufficient evidence of lost profits during detention.
 
 
 10
 Clearly the Halsted suffered no losses on the interrupted voyage, and it could make no difference to her regular course of business whether the collision occurred towards the beginning or the end of the successfully completed run. There is no proof offered that another Baltic voyage would have been undertaken but for the delay. The intineraries of the Halsted's three voyages apparently represent her normal course of business. On the record we must conclude that the evidence of earnings during the 241 days, covering three voyages, fairly represents what her average daily earnings would have been had she not been detained by the collision.[3] We therefore modify the commissioner's award and the district court's affirmance of it and direct that the Halsted's detention damages be computed at the average of the daily earnings, or $858.56 per day for 17 days, amounting to $14,595.52.
 
 
 11
 The other disputed item concerns the commissioner's award to the libellant of $6,194.83 for general average disbursements made by the Halsted as a result of the collision, consisting of 6% interest, 2% commission, and 2½% settling agent's commission.
 
 
 12
 General average disbursements made by the owner of a ship are funds advanced to meet the extraordinary expenses necessary to keep the ship going after a collision for the benefit of both hull and cargo owners. These funds, in effect, constitute a loan and the owner is therefore allowed interest on money advanced for the common purpose. Rule XXII, York-Antwerp Rules of 1924; see Lowndes and Rudolf, General Average, pp. 16, 27 (7th ed. 1948).
 
 
 13
 The Camden, in opposing interest on the general average disbursements, argues that because these disbursements included an amount for repairs to the Halsted, she has been allowed to recover interest on her own collision damages. This is alleged to be contrary to our decision in The Wright, 2 Cir., 1940, 109 F.2d 699 and in Canadian Aviation, Ltd. v. United States, 2 Cir., 1951, 187 F.2d 100, 101, which held that no interest is to be allowed on damages where there is a "both to blame" collision. In The Wright and Canadian Aviation cases, however, the interest which was disallowed was on the final award for damages before decree; no question of use of money for general average disbursements was involved. The award allowed by the Commissioner cannot be considered interest on damages. It is payment for the use of money which was necessary to keep the ship under way and the fact that repairs to the ship were included is immaterial. We therefore affirm the district court's holding on this issue.
 
 
 14
 As to the 2% commission awarded to the Halsted on her general average disbursements, Rule XXI of the York-Antwerp Rules of 1924 expressly provides for such commission; this ruling of the district court was clearly correct.
 
 
 15
 The 2½% settling agent's commission which the Halsted advanced is also a well established item of recovery. See Gulf Refining Co. v. Universal Ins. Co., 2 Cir., 1929, 32 F.2d 555, certiorari denied 280 U.S. 584, 50 S.Ct. 35, 74 L.Ed. 634. As the general average disbursements were advanced for the benefit of all interests in and aboard the ship, it became necessary thereafter to have a general average adjustment to apportion the loss between hull and cargo and to determine which items were properly included in general average. For this the settling agent was properly employed and the ruling of the district court was correct.
 
 The Camden's Damages
 
 16
 At the time of the collision, the Camden was sailing under a charter party entered into between Standard Oil Company (N. J.) (the owner) and Standard Oil Company of New Jersey, its subsidiary (the charterer). The commissioner used the charter party rate as a basis for measuring the owner's loss from the 15.986 days detention required to make repairs. The Halsted claims that because the charter party was entered into between parent and subsidiary the charter party rate was not a proper yardstick to be used to measure the Camden's detention damages and the owner should be made to prove the cost of hiring substitute vessels. We do not agree. The charter party rate constituted appropriate evidence from which to measure damages. See The Conqueror, supra, 166 U.S. at page 133, 17 S.Ct. at page 519. There is no evidence that the parent overreached the subsidiary in setting the rate of hire in the charter party, which was manifestly fair, being in accord with or lower than the current market. Accordingly, we affirm the district court's consideration of the charter party rate as proper and persuasive evidence for measuring the Camden's detention damages.
 
 
 17
 We turn now to the Camden's objections to the commissioner's findings regarding her damages during detention of 17.986 days for repairs. As the Camden had already been scheduled for a two day layoff to have some of her bulkheads tightened,[4] the Halsted is responsible for only 15.986 days detention. Under the charter party the charter hire had been paid in advance and after the collision the owner was required to and did return $43,196.33 for the full layoff period of the Camden, or $38,395 for 15.986 days.
 
 
 18
 The owner's recovery is limited to profits lost as a result of the collision. As the owner was required to pay certain voyage maintenance expenses, this is some amount less than the charter hire of $38,395. It was agreed by stipulation between the parties that the Camden's owner "* * * would have incurred port charges for a single round trip voyage of $1,508.19, and in addition would have incurred per diem operating costs of $1,020.50, made up of wages of $444.19, provisions, $70.00; fuel $436.15, and stores, $70.16" [emphasis added]. The Camden's expenses for 15.986 days thus would have totalled $17,821.90. Deducting these expenses from the $38,395 gross charter hire to arrive at the profits which the Camden would have earned over the detention period, the detention loss awarded to the Camden came to $20,573.10.
 
 
 19
 The owner of the Camden does not question the reasoning behind the award of detention damages. It does object, however, to the use of the stipulation to determine the voyage expenses. The owner of the Camden urges that according to the terms of the charter party, port charges and fuel costs were for the account of the charterer, and, as a result, would never have been among the voyage expenses of the owner. It therefore claims that as it would not have had to pay them, the deductions for these expenses was incorrect.
 
 
 20
 We do not dispute the owner's reading of the charter party. The stipulation, however, is the later instrument entered into between the parties to this action for the purpose of determining liability and, as between the two, the stipulation must control. The Camden contends that these figures were included in the stipulation for the sole purpose of placing all the material data before the commissioner. We cannot agree with this reading. Clearly, the stipulation was entered into to indicate the costs of the parties relevant to the damages claimed and the parties are bound by the language they have used. The stipulation expressly includes the disputed costs among the expenses which the owner "would have incurred." Under the circumstances, we can find no reason to give these words any other than their plain meaning. We therefore affirm the deduction of $17,821.90 from the $38,395 refund in order to arrive at the profits which the owner lost.
 
 
 21
 The owner also claims damages for $7,527.17 which it actually expended for maintenance of the Camden during the detention period.[5] The commissioner ruled against the owner, apparently on the theory that the maintenance had already been recovered once as voyage maintenance expenses as it had been considered in computing lost profits during detention. His report states:
 
 
 22
 "Since that detention recovery represents gross charter hire on a time charter, no reason exists why the shipowner should recover, in addition to the charter hire, the expense of the ship while undergoing repairs. Those expenses would have been incurred in any event, and the only compensation to the shipowner would be the gross charter hire, in any event."
 
 
 23
 The commissioner's ruling was followed by the district court on the ground that to allow the expenses "would involve duplication." On reargument the district court adhered to its original decision. We believe the commissioner was clearly wrong.
 
 
 24
 The money actually expended in maintaining the Camden during detention was an expense incurred by reason of the collision and the owner was entitled to recover therefor. The fact that voyage maintenance costs were considered in computing lost profits does not mean that the owner has been given the benefit of this item. Quite the contrary: all the commissioner did was to reduce the gross hire fee by such amount as the owner would have been required to spend in order to earn the fee; but the money was never spent. What was disbursed was $7,527.17. This fact was stipulated to by both parties and constitutes actual damages resulting from the collision. We therefore reverse the holding on this issue and direct that $7,527.17 detention maintenance expenses be awarded to the Camden.
 
 
 25
 In summary, we affirm the commissioner's report and the holding of the district court as to: (1) the award to the Halsted of interest and commission on general average disbursement and the settling agent's commission; (2) the use of the charter party rate as a proper measure of the Camden's detention damages; and (3) the use of the stipulation as to the deductions necessary to determine the Camden's lost profits.
 
 
 26
 We reverse and direct that judgment be entered in accordance with our conclusions: (1) an average of the daily earnings over the entire period of the three voyages be used to measure the Halsted's damages from detention, reducing them from $20,342.28 to $14,595.52; and (2) the damages awarded to the Camden include the $7,527.17 maintenance expenses during her detention for repairs.
 
 
 27
 The Halsted's damages are therefore reduced by $5,746.76 to a total of $62,494.90. The Camden's damages are therefore increased by $7,527.17 to $72,895.40. Since both parties were at fault, each is entitled to recover one half of his damages from the other: the Halsted $31,247.45; the Camden $36,447.70. We direct that judgment be entered in favor of the claimant, Standard Oil Company (N. J.) for the difference, $5,200.22.
 
 
 
 Notes:
 
 
 [1]
 On reargument the district court amended its decision to correct two errors: (1) adjusting the commissioner's finding of $16,213.71 unincurred voyage maintenance expenses for the Camden to $16,313.71, to account for an error of $100 in computation; and (2) adding $1,508.19 to these unincurred expenses, constituting anticipated port charges which the commissioner, by oversight, failed to include. Thus corrected these expenses totalled $17,821.90. When deducted from the $38,395 refunded, instead of the original award of $22,181.29, the Camden's detention damages were held to be $20,573.10
 The final award was as follows:
 Damages to the Halsted (by stipulation) $41,017.31; detention damages $20,342.28 (loss of 17 days profit) plus $687.24 (detention maintenance expenses); general average disbursements $6,194.83; total $68,241.66; recovery of one half, or $34,120.83.
 Damages to the Camden (by stipulation) $43,402.38; detention damages $20,573.10; cargo damages (by stipulation) $1,392.75; total $65,368.23; recovery of one half, or $33,691.92.
 The Halsted's recovery exceeded the Camden's, and accordingly libellant was awarded the $428.91 difference.
 
 
 [2]
 The Conqueror, supra, 166 U.S. at page 127, 17 S.Ct. at page 516. See The Europe, 9 Cir., 1911, 190 F. 475, 482, using an average of per diem profits for the preceding five years; Simpson v. State of California, 9 Cir., 1893, 54 F. 404, 407, using the average daily earnings for a period of six months before and six months after the collision
 
 
 [3]
 Where the voyages do not fairly represent normal average earnings they should not be considered. Thus in The Gylfe v. The Trujillo, 2 Cir., 1954, 209 F.2d 386, 389, consideration of the precollision voyage was ruled out because the market had gone into a sudden decline. In Quevvilly-Sampson, D.C.S.D. N.Y.,1938, A.M.C. 347, 357, the post-collision voyage was ruled out because World War I had caused an artificial and rapid inflation in market prices. But see The Bulgaria, D.C.N.D.N.Y.1897, 83 F. 312, using the average earnings of the pre-collision, collision and post-collision voyages
 
 
 [4]
 While nothing appears in the record on the subject, both parties seem to assume that the bulkhead work was done during the detention and that this work took two days, and we so treat it
 
 
 [5]
 The detention expenses actually came to $9,037.27 and included fuel, wages and provisions costs. In accordance with its argument on the stipulation-charter party issue, supra, the owner does not ask for fuel charges, thus reducing its maintenance claim to the stated $7,527.17, (Claimant's brief, p. 15.)