OIL SCREW NOAH'S ARK and Charles E. Graham, Appellants,

v.

BENTLEY & FELTON CORPORATION, as Owners of the OIL SCREW CUD-JOE and on behalf of her Master, Henry F. Godley and crew, Appellees.

No. 20058.

United States Court of Appeals Fifth Circuit.

Aug. 15, 1963.

James L. Hurley, Miami, Fla., William S. Stone, New Orleans, La., for appellants, Deutsch, Kerrigan & Stiles, New Orleans, La., Fowler, White, Gillen, Humkey & Trenam, Miami, Fla., of counsel.

Linwood Anderson, Gerard Ehrich, Miami, Fla., Robert C. Youmans, Key West, Fla., Gay & Anderson, Miami, Fla., Ehrich & Zuckerman, Miami, Fla., for appellees, Russell C. Gay, Miami, Fla., of counsel.

Before CAMERON and BROWN, Circuit Judges, and WHITEHURST, District Judge.

JOHN R. BROWN, Circuit Judge.

Indigenous to her name and the scriptural tradition that all things must come in pairs, the NOAH'S ARK is back again to provide the second of a pair of appeals from a pair of trials involving a pair of claims for salvage and for damage done by the salvors. On the prior appeal, 5 Cir., 1961, 292 F.2d 437, 1961 AMC 1641, we reversed and remanded the case for a further trial on the "crucial matters occurring after the Noah's Ark slipped off the sand dredge." We affirmed much, however. Thus we said: "Established by the Trial Court's findings and action by us are two things requiring no further inquiry: (1) valuable salvage services were rendered by the Cudjoe to the Noah's Ark; and (2) the salvor was guilty of negligence

for which it is legally responsible in casting off the Noah's Ark without warning." Reserved for the new trial and determination by the District Court on remand were the questions of the "amount of the salvage award, the extent to which is should be diminished if at all, the extent and nature of damage sustained by the Noah's Ark for which the salvor is legally responsible under the applicable standards \* \* \*." 292 F.2d 437, 443.

On the retrial based on the former record as supplemented by further oral testimony from only two live swearers, one a professional salvor, the other a marine surveyor, and each of whom had testified on the former trial, a different Judge arrived at these conclusions. The award to the salvors was fixed at $7500 based on a value of $20,000 for the NOAH'S ARK and $40,000 for the salvor CUDJOE. But out of a cross claim of some $18,000 for damages (and detention) for the NOAH'S ARK, only $1,931.91 was found to be attributable to the grounding.[1] On striking the balance, the vessel owners are required to pay about $5500 to salvors for saving a vessel having a value of not more than $3000 as the result of damage sustained in the grounding and the subsequent sinking nine hours after the negligent act of the salvor.

At the outset, we must emphasize that it is not our function to retry these cases as we once could do. The clearly erroneous concept applies to admiralty as well as civil causes. Compagnia Maritima La Empressa, S. A. v. Pickard, 5 Cir., 1963, 320 F.2d 829. But for nautical as well as land-based litigation, we must also emphasize that such a review affords a greater latitude than would an appeal from a jury verdict. In the latter it is a question of substantial evidence. In the former, there is still the qualitative factor of the truth and right of the case—the impression

---

[1] The term "grounding," though indiscriminately used by all, is handy but not accurate. This covers the whole time the NOAH'S ARK was pounding against the wharf and bottom up to the time she sank. Our reference is primarily up to the time the vessel could have been pulled off had assistance been sought.

that a fundamentally wrong result has been reached. W. R. B. Corp. v. Geer, 5 Cir., 1963, 313 F.2d 750, 753.

■ Apart from valuation of the salvage service and the manner or extent to which it was to be diminished or lost by subsequent negligence of the salvor, there were two principal fact issues sent back for decision. First was the question whether the sinking of the NOAH'S ARK some nine hours after she fetched up against the dock could reasonably have been avoided by affirmative action on the part of her crew and owner. Second, assuming an answer to the first that sinking could have been avoided, there was the problem of distinguishing between those damages caused by the grounding, on the one hand, and those resulting from the subsequent sinking (and raising) of the vessel.

As to the first, the record is in some respects more positive than it was on the first trial. The professional salvor Gladding was recalled and testified at length in open court. He was positive that, while he successfully engaged in four or five other salvage jobs that same night, he had both time and facilities with which to pull the NOAH'S ARK off of the dock and tow her to a place of at least relative safety in the harbor. And there is no doubt that Gladding was around the dock about 9:00 p. m. available, so he says, to be employed. The Judge found that around 6:00 p. m. Gladding's salving tugs were docked in the harbor a short distance away and were fully manned, equipped and available to remove the NOAH'S ARK. He also found that had "Mr. Gladding been contacted, salvage efforts could have been commenced in a matter of minutes and could have been completed before any damage more than minor scraping of the bottom and side could have occurred." On this there was the further finding that "the failure to take any steps to save or protect this vessel after it had grounded constituted negligence on the part of the crew of the 'NOAH'S ARK.' This negligence was not foreseeable by the salvor and became a supervening proximate

cause of all damage thereafter suffered by the vessel. The 'ARK' was in charge of her master and fully manned, and the master and crew were obligated to see to the safety of their own vessel, as they easily could have done by the reasonable exercise of ordinary seamen's skills."

To the extent this was a fact conclusion that Gladding was available and was capable of pulling the NOAH'S ARK away from the dock, we do not feel that there is sufficient basis for completely rejecting it. In effect Judge Dyer arrived at the same conclusion as did Judge Lieb earlier. Of course the matter is not free from doubt for the record now, as it did earlier, contains the pessimistic appraisal of the situation by the Feltons, who were both knowledgeable and interested. See 292 F.2d 437, 443.

But we find no basis whatsoever for the further conclusion that had Gladding "been contacted, salvage efforts could have been commenced in a matter of minutes and could have been completed before any damage more than minor scraping of the bottom and side could have occurred." Stated most favorably to the salvor, Gladding never fixed the time it would take to remove the NOAH'S ARK from this danger at less than a couple of hours. Indeed, most of the questions to the marine surveyor witness eliciting expert opinions to distinguish specific items of damage caused by the grounding, rather than the subsequent sinking, were generally couched in terms of the vessel being pulled away by about 9:00 o'clock or in a couple of hours, etc. Consequently, it is overwhelmingly established that considerable time would have been taken. More than that, time brought damage. The angry sea was at work. The bow of the vessel had smashed into the dock. The outrigger boom was lashing about wildly doing extensive damage to the building on the adjacent pier. From the nature of this vessel, a small wooden hull being pounded against the rocky bottom, smashing against the adjacent dock and wallowing in seas being driven by near hurricane winds, it is certain that substantial dam-

age was being done minute by minute during all of this time. The CUDJOE is responsible for all of this, and the uncertainties arise not from the *fact* of damage, but the calculation of consequences. See International Union of Operating Engineers, Local 653 v. Bay City Erection Co., 5 Cir., 1962, 300 F.2d 270, 272.

■ We would also accept the Court's implied negative finding of the absence of prior substantial damage to the engine and to facilities in the engine room.[2] After deducting the estimated cost ($300) of repairing engine damage giving rise to the necessity for salvage at sea and also the cost of betterments, the total for engine repairs was $2,289.37. Surveyor Jones disallowed all of this on the ground that during the tow by the CUDJOE, the NOAH'S ARK, from a broken suction line and washing seas, took on considerable water in her engine room. Based upon some testimony from crew members, he concluded that the water level was sufficiently high for sea water to enter the engine, damage the generator, starter motor and other related appliances. This view is still urged by the salvor in the briefs before us. It is plain, however, from the finding that "all damages, except the following would have been avoided," the Judge declined to credit Jones' expert opinion because he declined to credit the underlying hypothesis. While there certainly is testimony that puts the water, in the words of the young inexperienced seaman "three feet above the knees" and other

testimony indicates that water got above the floorboards, we do not think it was such as to compel such a finding, and we certainly would decline to make one ourselves.[3]

■ It bears repeating what we said in Southport Transit Co. v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, 954, 1956 AMC 1498, and repeated in 292 F.2d 437, 442, that this problem being one akin to avoidable consequences, the trial court was required to "regard carefully that the [vessel] owner is the innocent party whose property was damaged, to some extent at least, by negligent performance of [the salvage operation]. Under the teaching of the doctrine of avoidable consequence, a substantial burden is therefore heavy on the wrongdoer to establish that prudence called for action by the tug owner at one or more of these stages; and, that had it been taken, the resulting damage would have been substantially different. * * *" 292 F.2d 437, 442. Judge Learned Hand once expressed the analogous problems in this way. "The situation is the same when one of the two contributing factors is not the result of an actionable fault: again, the single tortfeasor cannot be allowed to escape through the meshes of a logical net. He is the wrongdoer; let him unravel the casuistries resulting from his wrong." Navigazione Libera TSA v. Newton Creek Towing Co., 2 Cir., 1938, 98 F.2d 694, 697, 1938 AMC 1419. One of our troubles is that the Judge seemed to reverse the tables.[4]

2. This arises from this affirmative finding:
   "28. Had the master and crew of the 'NOAH'S ARK' exercised reasonable care and diligence to remove the vessel from the strand at any time before 3:00 a.m., when she finally went over on her side, all damages, except the following would have been avoided:

   | | |
   |---|---:|
   | Thompson Enterprises | $ 676.45 |
   | Recupero Marine | 271.38 |
   | Miami Propeller Service | 156.88 |
   | Gerald Watkins | 375.00 |
   | | 452.20 |
   | | $1,931.91" |

3. We put in the same category the invoice of Key West Electrical Repair Company in the net amount of $1167.70 representing repairs to the wiring, pump, generator, starter and battery.

4. Continuing finding Par. 28, see note 2, supra, the Judge went on:
   "In the present state of the record it is impossible to ascertain with any precision the damages caused by the stranding, as distinguished from those sustained during the salvage operation and those caused by the 'NOAH'S ARK'S' own supervening negligence. In fact,

■ We agree with the salvor that as to a number of items, the District Court had sufficient basis for concluding that the tort-feasor (salvor) had carried the burden of showing distinguishable damages due solely to the NOAH'S ARK'S failure to take steps later that evening to minimize the damage.[5] And there are others as to which, under the teaching of Southport, a division of damages would be in order.[6] But there are a number of instances of clearly established damage in which all the trial Court had was what we have, and that is little more than the dollar figure, either stated directly or by terms of percentage,[7] which the surveyor-witness Jones attributed to the grounding or to the sinking.

■ Two other items certainly have to be taken into account. The first is the cost that would have been incurred had Gladding been hired, as the salvor now contends, to extricate the NOAH'S ARK from the consequence of the salvor's neglect. Their brief asserts that no notice may be taken of this since it was not proved. The salvor forgets, however, that this is a part of the very expenses which it claims in prudence the NOAH'S ARK should have incurred to minimize damage. For a tort-feasor to contend that the expenditure should have been incurred is the equivalent of saying that

in prudence the amount should have been spent. To establish what is prudent, the burden is obviously on the tort-feasor. Under these circumstances, all that can be done now is to make a liberal allowance.

■ Of even more importance is the failure of the Court to make any allowance whatsoever for detention losses. While it would have perhaps presented some difficulties for us to disagree with a figure fixed by the Judge had he done so, we are faced with no such problem. Here there is an entire absence of any finding or, for that matter, an affirmative finding that there was no loss of profits. The testimony offered showed earnings over a representative period of time of several comparable shrimp vessels fishing in the same waters as the NOAH'S ARK. There was no real testimony to the contrary, at best only a few casual off-the-cuff protestations by the Feltons that shrimping, sale of shrimp, and weather all were such that the business was very unprofitable. Certainly in the absence of a finding by the District Court crediting such testimony we find ourselves unable to accept it in the light of their extensive operations, the maintenance of a very large fleet and their own activities.[8] Of course regard must

---

there are huge gaps in the proof as to damages, since most of the evidence on this question in the first trial was never properly connected up * * *."

5. This would include such items as:

Loss of fuel, lube, groceries $ 522.15
Damage to nets 640.38
Stephenson Marine Electronics 3,099.00
Standard marine supply (tools, clothes, etc.) 669.75
Key West Bedding 65.50
Sears—sheets, bedding 61.60
Garcia—broken glass 152.70

6. See for example transportation and subsistence expense of the owner of the NOAH'S ARK while supervising repairs, telephone calls, etc. totaling

$ 319.36
24.00
25.60
48.00
———
$ 416.96

Thompson Enterprises $1,966.50
Gerald Watkins topside repair $1,292.00

7. For example with no discernible indication of any detail, he attributed $676.45 of the Thompson Enterprise bill, the two separate items of $375 and $450.20 out of the Gerald Watkins' bill (see note 2, supra) which aggregated $2,792.00, and 40% of the Recupero Marine bill to the grounding, the balance to the sinking.

8. Using representative operations of comparable vessels, the gross operating profits amounted to $2500 to $2900 for the two months' lay up period plus an allowance of some $500 to $900 for the Master's share of the lay. The criticism in counsel's running objections that there was no showing of overhead expenses is not decisive. Detention, generally speaking, may be calculated by gross operating profits *less* savings, or net profits *plus* out-of-pocket expenses. See, e. g., Moore-McCormack Lines v. S.S.

be had for the fact that the NOAH'S ARK required salvage because of an engine breakdown. It is uncontradicted that these repairs (apparently to a connecting rod) would not have cost in excess of $300 and by themselves would not have kept the NOAH'S ARK out of commission for more than a very few days. We may assume that the tort-feasor gets a free ride for this period of time both as to detention and other so-called common expenses, such as drydock lay days, and the like. But from the moment the time required for those engine repairs expired, down to the completion of the repairs for the grounding (not subsequent sinking) damage, the vessel owner recovers in full from the tort-feasor even though it may be assumed that during such time distinguishable "sinking" damages were being repaired. Atlantic Refining Co. v. Matson Navigation Co., 3 Cir., 1958, 253 F.2d 777, 1958 AMC 1316, affirming E.D.Pa.1957, 150 F.Supp. 516, 1957 AMC 1318; Moore-McCormack Lines v. S.S. Esso Camden, 2 Cir., 1957, 244 F.2d 198, 1957 AMC 971; The Super X—Socony No. 16, S.D.N.Y.1936, 15 F.Supp. 294, 296, 1936 AMC 409; The Pocahontas, S.D.N.Y.1939, 28 F.Supp. 955, 1940 AMC 351, reversed 2 Cir., 1940, 109 F.2d 929, 1940 AMC 685, cert. denied, 310 U.S. 641, 60 S.Ct. 1088, 84 L.Ed. 1409, 1940 AMC 860; Pan American Petroleum & Transport Co. v. United States, 2 Cir., 1928, 27 F.2d 684, 1928 AMC 1347; Clyde S.S. Co. v. City of New York, 2 Cir., 1927, 20 F.2d 381, 1927 AMC 1098.

■■■ This brings us, then, to the question: what should be done? Ordinarily we would remand the case with an indication of the guidelines to be followed for recomputation of the damages by the District Court or a Commissioner. But if anything was clear on the argument, it was the unanimous feeling of all counsel that they wanted no more trials in this case. Without undertaking to articulate it in terms of any specific power, the proctors implored us to wind up this case which, with each trial, deposition, hearing, and appeal seems to get more, not less, complicated. We can sympathize with this weariness and readily acquiesce in what might otherwise be an unorthodox contribution to the essential end of reducing backlogs of court congestion both here and below. In so doing, we have no illusions that the result we reach will even remotely approach scientific judgment. To the difficulties faced by two earnest and experienced admiralty Judges who have successively wrestled with a record of continual, frustrating, argumentative objections, interruptions, and a truncated presentation of depositions or excerpts from the prior hearing, we may add those of our own growing out of the effort to decipher the inscrutable.[9]

But we are in full agreement with this commendable desire to bring this case to an end since we share with them

Esso Camden, 2 Cir., 1957, 244 F.2d 198, 1957 AMC 971. The fact that the repair period was extended because of the Marshal's seizure under the salvor's libel for salvage certainly offers no extenuation.

9. This case seems to have been plagued with unnecessary, but irrepressible, obstacles to an orderly development or ascertainment of the truth. There was constant petty bickering over the most picayunish matters. For example, where exact detail was needed to determine truth, marine surveyor witnesses were kept from examining, testifying directly from, or offering in evidence detailed survey reports presumably because of the old

dialectical dilemma between (a) a memory refresher and (b) a record of a past recollection. Cf. NLRB v. Tex-Tan, Inc., 5 Cir., 1963, 318 F.2d 472 at 484, note 33 and appended text [No. 19,715, May 24, 1963]; Companie De Navigacion Fraissinet & Cyprien Fabre, S.A. v. Mondial United Corp., 5 Cir., 1963, 316 F.2d 163 at 171, 1963 AMC 946. What the Judge referred to as "gaps in the proof as to damages, since * * * the evidence * * * was never properly connected up * * *" (see note 4, supra), were due in no small measure to these actions. At one time a surveyor witness almost gave up in what we would regard as understandable despair.

the conviction borne by the experience so far that if it goes back once more, there will be more, not less, contention, and all may well have lost the opportunity to achieve the goal of Mr. Justice Story's apothegm that "[I]t is for the public interest and policy to make an end to litigation * * *" so that " * * * suits may not be immortal, while men are mortal." Ocean Ins. Co. v. Fields, 18 Fed.Cas. 532; Bros. Inc. v. W. E. Grace Mfg. Co., 5 Cir., 1963, 320 F.2d 594. This process unavoidably calls for a liberal use of the equitable discretion of a nautical Chancellor, Compania Anonima Venezolana De Navegacion v. A. J. Perez Export Co., 5 Cir., 1962, 303 F.2d 692, 699, 1962 AMC 1710, cert. denied, 371 U.S. 942, 83 S.Ct. 321, 9 L.Ed.2d 276, to arrive at a practical but final and reasonably just result as in Challenger, Inc. v. Durno, 5 Cir., 1955, 227 F.2d 918, 1956 AMC 111; 245 F.2d 815, 1958 AMC 125. And thus the case ends with what others may call, as we did in the first one, a judgment with "Solomonic overtones," 292 F.2d 437, 438.

The consequence is that we reverse the decree and remand the cause with directions to enter a decree allowing the amounts fixed by us.[10] In view of this adjustment and the fact of substantial injury sustained by the NOAH'S ARK, we think costs both here and below should be divided equally. Yacht "Mary Jane" v. Broward Marine, Inc., 5 Cir., 1963, 313 F.2d 516, 1963 AMC 868.

Reversed and remanded.

---

10. The following amounts are to be awarded, but we do not undertake to strike the balance for fear this might complicate matters and precipitate further litigation *vis-a-vis* each vessel owner and its respective underwriters:

| | | | |
|---|---|---|---|
| Award to Salvors | | | $7,500.00 |
| Award to NOAH'S ARK: | | | |
| Engine repairs | $2,289.37 | | |
| Key West Elec. | 1,000.00 | | |
| Gerald Watkins— bottom damage | 1,500.00 | | |
| Miami propellor service | 156.88 | | |
| Allow—vicarious salvage by Gladding | 500.00 | $5,446.25 | |
| Divided Items: | | | |
| Thompson | $1,966.50 | $ 983.25 | |
| Watkins topside | 1,292.00 | 646.00 | |
| Travel, etc. (note 6, supra) | 416.96 | 208.48 | |
| Recupero | 682.46 | 341.23 | 2,178.96 |
| Detention: | | | |
| Basis $2500 2 mos. | | | |
| 700 Master's lay | | | |
| $3200 | | | |
| 21 days @ $53 | | 1,113.00 | |
| Total to NOAH'S ARK | | | $8,738.21 |