THE Oil Screw **NOAH'S ARK** and
Charles E. Graham, Appellants,

v.

**BENTLEY & FELTON CORPORATION,**
owner of THE Oil Screw **CUDJOE**
et al., Appellees.

No. 18696.

United States Court of Appeals
Fifth Circuit.

June 30, 1961.

William S. Stone, New Orleans, La., Walter Humkey, James L. Hurley, Miami, Fla. (Deutsch, Kerrigan & Stiles, New Orleans, La., Fowler, White, Gillen, Humkey & Trenam, Miami, Fla., of counsel), for appellant and cross-appellee.

Linwood Anderson, Russell C. Gay, Miami, Fla., Robert C. Youmans, Key West, Fla., Gerard Ehrich, Gay & Anderson, Miami, Fla. (Ehrich & Zuckerman, Miami, Fla., of counsel), for appellee and cross-appellant.

Before JONES and BROWN, Circuit Judges, and DE VANE, District Judge.

JOHN R. BROWN, Circuit Judge.

Growing out of the salvage of the Noah's Ark, three principal questions are raised by this appeal and cross appeal. The first is the nature of the legal liability of the salvor, the Shrimper Cudjoe, for damage sustained by the Noah's Ark as a result of the salvor's negligence.

The second is the extent of the damage attributable to the fault of the salvor. And the third is whether the salvage award, reduced because of the salvor's negligence, was inadequate.

Giving it perhaps even more of a scriptural flavor, the decree was an unusual one with Solomonic overtones. The Court held, first, that the salvage award should be reduced markedly because of negligence of the salvor Cudjoe in releasing the Noah's Ark without warning after arrival in the port of refuge. Despite this, on the Noah's Ark cross-libel for affirmative recovery of damages, it then held that this claim should be dismissed since the extensive damage sustained by her pounding on the rocks after negligent release was due to the sole fault of her own crew and in no sense the proximate result of negligence of the salvor. No one is satisfied and all appeal. When we say "all appeal," we mean it literally. For not the least of the complications in what otherwise appears to be a pretty simple case is the array of counsel nominally on the same side, but each having separate interests. One proctor appeared for the Cudjoe's salvage claim, another to defend the damage cross-libel. And, as might have been expected for one bearing the name of the Noah's Ark, her counsel came by twos apparently under a similar division on her behalf. Reacting to this, the Court added to the troubles by attempting to keep the trial of the salvage libel, with its answer of negligent damage to the Noah's Ark as a defense or set-off, separate from that of her cross-libel for the same damages to which defense was made by the Cudjoe. The result was that the Judge had to listen to frequent repetitious reading of the same depositions or extended colloquy of counsel as to just what was then being tried, offered or determined. We stress this because in reality it was one case. And it is this failure—through the influence of these extraneous factors—to recognize it as substantially one case which, we feel, is in large part responsible for the contradictory conclusions of the Trial Court.

The Noah's Ark is a small shrimper 57 feet long. On January 1, 1958, when about 70 miles west of Key West, Florida, her engine broke down. She attempted to get help from the Coast Guard but this was declined. By exchange of radio messages the Cudjoe, also a shrimper, advised she would help. The tow started about 10:00 p. m. January 1. The seas were calm and weather good, but warnings were out for impending heavy weather. Early in the morning on January 2 winds and seas whipped up. The nylon anchor line of the Noah's Ark being used for a tow line parted. Increased seas caused it to part again. A seacock was damaged and the Noah's Ark started taking on water. The auxiliary pump became inoperative so that there was a considerable amount of water in the engine space over the bilges from sea water and melting ice. The tow line parted again. Finally the Noah's Ark rigged a new tow line by using one of her steel trawl cables.

Approaching Key West Harbor the Coast Guard again was unable to render assistance. Radio communications still existed between the Cudjoe and Noah's Ark and while the evidence and terms of it was somewhat vague, the Judge found that the two masters agreed that on arrival in Key West Harbor, the Noah's Ark would make fast to the cable vessel Western Union regularly anchored in the Bight. About 6:00 p. m. January 2 the vessels entered Key West Harbor. The winds were then 60 to 72 mph varying from NE to NNW. The weather was nasty, cold and with intermittent downpours of rain. The Noah's Ark was still on the towing cable some 450 feet long. The Cudjoe heading into the wind made a line fast from her bow to a Navy finger pier on the north side of the harbor. The Noah's Ark streaming on the trawl cable was parallel to and close by the Western Union. The time was estimated from three to four minutes to as much as fifteen to twenty minutes. But the Court found that the wind held the Noah's Ark alongside for "several moments." One crew member of the Noah's Ark may

have momentarily been aboard the Western Union but with wind and waves affecting both, it was not possible to secure.

At this point, and with no explanation whatsoever which would withstand even the slightest cross-examination, the Cudjoe cast off the trawl tow line. A faint claim is made that Navy guards were seen approaching and the Cudjoe's master was apprehensive that they would make him cast off the line from the pier. Of like weight was the suggestion that the long tow line presented a danger to vessels between the Cudjoe's stern and the bow of the Noah's Ark. The District Court paid these scant heed, as do we. It found categorically that while the master of the Cudjoe believed that the Noah's Ark "was fast to the Western Union" the Cudjoe cast the line loose "without any warning to the Noah's Ark." At this time the Cudjoe knew that the Noah's Ark's radio was no longer serviceable. With neither radio nor any other means by those aboard the Noah's Ark to communicate essential information to the Cudjoe, the Cudjoe made a baseless assumption and cast off.

The Noah's Ark, a helpless, powerless derelict, was adrift in 60–70 mph winds. She was caused "to drift with the high wind several hundred yards across the harbor, where she came alongside of and in contact with a sand dredge * * * tied to the seawall" on the south side of Key West Bight.

■ While we defer for a moment the discussion of the legal principles concerning the duty of salvors, it simplifies the problem to assay the conduct of the Noah's Ark and the Cudjoe on the assumption that ordinary prudence was the standard of care with respect to this initial occurrence. On that inquiry it is plain that this was palpable and glaring fault on the part of the Cudjoe. The District Court held as much in the formal conclusions of law that the "salvors * * were guilty of negligence in releasing the [Noah's Ark] without any warning and without ascertaining * * * whether

* * * the Noah's Ark was fast to the Western Union."

■ Equally plain to us is the freedom from fault of the Noah's Ark in her drifting southward and thereafter until she fetched up along the cement seawall. The first stage from the position alongside the Western Union to the sand dredge was one of helplessness. Many theories were advanced to place blame on the Noah's Ark, principally for not dropping an anchor. She had two anchors, but no anchor line. Her anchor line had parted several times in the salvage operations. There is no evidence that had the crew in this emergency attempted to rig the anchor to the remnant anchor line the anchor in this short time and distance would have been effective in the teeth of this driving gale. As the Noah's Ark came alongside the sand dredge, one line was put out but soon parted. A crew member tried hard to throw a line on a nearby dolphin but without success. Much was made by the Cudjoe of the Noah's Ark's failure to put out more lines to the dredge including the unshipping of the remaining steel trawl cable to use it as mooring lines to make fast. But the Court did not find this a fault, nor do we. The position of the Noah's Ark was at that moment extremely precarious as the owner of the Cudjoe, the late tortfeasor, well knew. Those ashore, which included the principal stockholders of the corporate owner of the Cudjoe (the salvor claimant) observing the situation, recognized that if the Noah's Ark slipped off the sand dredge, the wind and water would force her into a small U-shaped slip along the concrete seawall. That happened shortly so that "at approximately 6:30 p. m." she was "alongside the seawall * * * in an upright position but touching bottom in the shallow water." And what happened in this manner was certainly within the range of likely consequence, including the element that in the emergency conditions created by the Cudjoe's cutting her adrift, the Noah's Ark might make mistakes in her responsive efforts to overcome the fault-made hazards. Restatement of Torts, §

449; Slattery v. Marra Brothers, 2 Cir., 1951, 186 F.2d 134, at page 136, 1951 A.M.C. 183.

It is at this spot, and beginning with this time, but not before, that the Court held the Noah's Ark at fault. The Court's findings of fact show that culpable fault commenced after the Noah's Ark fetched up. This began, the Court found, when the "captain of the Noah's Ark stepped ashore and * * * made a long distance telephone call * * * to the owner." The Court condemned her for actions subsequent to that occurrence. The Court found that "At no time during the evening did the captain or crew of the Noah's Ark seek any assistance which was available from bystanders or from local marine facilities, or try to borrow lines to secure the vessel, or attempt to borrow a bilge pump from other vessels. * * * Nor did the captain * * * contact the local commercial salvor, Ray Gladding, owner of a tug who was at the scene and available, to tow the Noah's Ark to deeper waters and prevent the damage to her from the bay bottom and from contact with the Lobster House." The vessel pounded against the rocky bottom and seawall and about 3:00 a. m. January 3, capsized and sunk.

On those findings the Court concluded that the subsequent sinking of the Noah's Ark was "caused by the sole negligence of her captain and crew" in their "failure to seek assistance from professional salvors or from bystanders, when such assistance was readily available, and their complete failure to discharge their duties owed to their own vessel."

The Court, after finding the Noah's Ark to have been of the value of $20,000 the moment before the Cudjoe cast off the line, found that valuable salvage services had been rendered. But then, as pointed out earlier, the Court fixed the award at $2,000 because the salvage "award must be diminished due to negligence" on the part of the Cudjoe. Simultaneously the Court denied the Noah's Ark's affirmative claim for damages on the ground that these very same damages were due to the sole negligence of her own crew.

Just how the Judge could say that the salvors had been guilty of negligence requiring diminution of the award and at the same time hold that *all damage* done after arrival in Key West Harbor was due to the sole negligence of the Noah's Ark crew remains a mystery. An explanation certainly cannot be found in the legal conclusion that the "negligence of the salvors did not amount to gross negligence or wilful misconduct producing a distinguishable and separate injury to the salved vessel * * *."

We think, however, that this finding pinpoints the basic error in the Court's approach. In stating that, we accept the conclusion that the actions of the Cudjoe "did not amount to gross negligence or wilful misconduct" because that is actually irrelevant. The Court tied this to a further conclusion that the non-gross negligence, non-wilful misconduct did not produce a "distinguishable and separate injury to the salved vessel." Without at this time attempting to fix or specify exactly what items of damage were thereby caused, it is plain to us that whatever damages were suffered by the Noah's Ark after the Cudjoe cut loose the line were distinguishable and independent.

█ This is important since for distinguishable independent damages done by the salvor, we are of like opinion that the maritime law holds the salvor to the usual standard of ordinary prudence. Norris, a well regarded text writer, in the Law of Salvage (1958) draws these conclusions from all of the American cases which he cites and discusses. "The salvors who undertake a service to distressed property obligate themselves to take reasonable care of the property in their charge and they may be responsible for damages which they inflict on that property * * *. This duty has been defined as binding them 'to take the same kind of care, and exercise the same degree of diligence in keeping the property placed in their custody, that a prudent man ordinarily takes and exercises in keeping his own property.' " §

120 at 205–6. The basic principle is then succinctly stated. "When a distinguishable injury to the salved property has resulted from the negligence of persons undertaking a salvage service, it may result not only in a diminution of the award or of a total forfeiture, but in an affirmative award of damages against the salving vessel or the salvors." Norris, supra at 206.

Because of obvious policy considerations to encourage the human response of men of the sea to the saving of life and property, it is true that mistaken action of the salvor in the efforts to effectuate salvage is treated with considerable lenience. But the Second Circuit has pointed out that while "negligence in a would-be salvor is perhaps viewed with a benevolent eye * * *" nevertheless when it is "plainly proved, it entails responsibility, as does negligence in the performance of any other assumed or imposed duty." The Cape Race, 2 Cir., 1927, 18 F.2d 79, at page 81, 1927 A.M.C. 628. Years before that Court in Serviss v. Ferguson, 2 Cir., 1897, 84 F. 202, had affirmed per curiam "on opinion of district judge" the decision of Judge Addison Brown. The salvor was held liable for simple non-wanton, non-wilful, non-gross negligence for failure to mark the presence of the salved vessel which sunk at the pier after completion of the salvage. This distinguished Judge who did so much to mold and develop American maritime law had this to say. "If it seems a hardship to require the defendant to pay for a boat they have rescued, possibly from complete destruction, it must be remembered that the compensation which the court awards for salvage services includes the recompense for all the necessary care of the salved property; and that the seeming hardship is no other or different than that in which any other negligent loss involves every ordinary bailiff for hire." Norris, supra, § 123 at 210–12.

██ All of the significant American and English cases were painstakingly considered by Chief Judge Biggs (joined by Judges Goodrich and Staley) dissenting in P. Dougherty Co. v. United States, 3 Cir., 1953, 207 F.2d 626, 637, 1953 A.M.C. 1541, certiorari denied 347 U.S. 912, 74 S.Ct. 476, 98 L.Ed. 1068, characterized by us as "an exhaustive and penetrating analysis," United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, at page 326, note 14. The key to the correct legal principle is the character of the injury inflicted—i. e., distinguishable or, as sometimes called, independent. The requirement for wilful or gross negligence as an element of salvor liability relates to injuries of a non-distinguishable, non-independent kind. In a very broad sense the latter covers errors that made the salvage ineffectual. A distinguishable injury, on the other hand, is some type of damage sustained by the salved vessel other than that which she would have suffered had not salvage efforts been undertaken to extricate her from the perils to which she was exposed. See note 17, 207 F.2d 626, at page 644. In other words it is a harm distinct from that from which the vessel is being saved.

Here there is no effort to hold the Cudjoe liable for ineffectual salvage. On the contrary, this was performed and performed well. The disabled Noah's Ark was brought safely to the port of refuge. The Cudjoe is not pursued because had she taken this rather than that particular course of action the Noah's Ark would have been rescued. To the contrary, she is cast because having performed salvage diligently and successfully, she failed to exercise ordinary care for the property then in her actual control. Norris, supra, § 121 at 207.

██ The contradictory conclusions of the District Court did seem at first to hold the Cudjoe accountable to a degree for her obvious negligence. But in view of the categorical conclusions that this "did not amount to gross negligence or wilful conduct producing a distinguishable and separate injury" the Court's error permeated all that was to follow.

This is so because on this theory of the District Court, mistaken as it was, the predicament of the Noah's Ark from

the time she slipped off the sand dredge until her final sinking was entirely of her own making and in no way attributable to any negligence for which the Cudjoe was legally responsible. That, as we have pointed out, is an indefensible conclusion.

Once it is recognized that the predicament of the Noah's Ark was due in fact and law solely to the flagrant fault of the Cudjoe, the whole case concerning conduct thereafter takes on a different complexion. That brings into play the principles of—or akin to—the doctrine of avoidable consequences which we discussed at great length in Southport Transit Co. v. Avondale Marine Ways, 5 Cir., 1956, 234 F.2d 947, at pages 951–954, 1956 A.M.C. 1498. What we there said has considerable operative significance in the light of our conclusion on the legal fault of the Cudjoe. "On the remand, however, the Court must regard carefully that the tug owner is the innocent party whose property was damaged, to some extent at least, by negligent performance of its contract by the shipyard. Under the teaching of the doctrine of avoidable consequence, a substantial burden is therefore heavy on the wrongdoer to establish that prudence * * * for action by the tug owner at one or more of these stages; and, that had it been taken, the resulting damage would have been substantially different. Nor will inability satisfactorily to differentiate between the consequences of the tortfeasor's conduct and the innocent injured party's inaction be measured or its significance determined by common law notions which might deny recovery altogether." 234 F.2d 947, at page 954.

Additionally the circumstances of high wind, wave and water in which this occurred may well require that the law regard this as a situation in which the negligence of the Cudjoe was still at work, i. e., in a continuing sense. 234 F. 2d 947, at page 955. A few factors pointing in that direction may be briefly mentioned. The Noah's Ark fetched up alongside the seawall adjacent to the pier of the owner of the Cudjoe. The Cudjoe under her own power was able to moor safely not too far away. Help, in the way of lines, fenders, and pumps, was tendered to the Noah's Ark by stockholder representatives of the owner of the Cudjoe who happened to be nearby, but these were declined. An earlier assurance made by radio to the Noah's Ark by the Cudjoe's master shortly before arriving in the Harbor to seek out a salvor went unfulfilled, apparently due to apprehension over who would be responsible under such circumstances for the salvor's bill. Both the offer and the assurance were looked upon by the Cudjoe and the Court as acts of the Good Samaritan. But Bentley & Felton Corporation could claim no such status after the Noah's Ark was cast adrift by the Cudjoe. It was a tortfeasor whose wrong had put the victim in this hapless state.

Next, from the standpoint of physical forces, it is obvious that the real damage was due to the continual pounding of the Noah's Ark against the bottom and the seawall. Fenders would not have prevented that. And with the strong backwash current in this U-shaped slip described and acknowledged by all, the evidence does not yet show how additional lines from the Noah's Ark to the seawall could have overcome this terrific pounding on a vessel known to be taking water. Relief from this devastating stress on the wooden hull would come only from her being pulled out of the slip. A commercial salvor did testify that he was there about 9:00 p. m. and observed the situation of the Noah's Ark. He expressed the opinion that with his salvage tug, had he been hired at that time, he could have pulled her free to a safe mooring. But by this time considerable damage must already have occurred from the vessel's pounding. And more would occur until such salvage operations were concluded. The testimony was vague indeed on just what time the commercial salvage operations could have commenced had the master of the Noah's Ark requested them. Quite obviously so much damage as had, or would have, occurred cannot be attributed to the Noah's Ark. That

likewise has to be measured against the real probability of success. The commercial salvor was optimistic, but the representatives of Cudjoe's owners expressed strong doubts that with the backwash the Noah's Ark could have been pulled out under those weather conditions. As put by one of these Feltons who was a witness to the incident, "with the seas raging in on her, and the backwash driving * * * when she got" against the concrete dock "there was no use." His brother, likewise a stockholder in the organization, was more emphatic. Once the Noah's Ark was in this position, to move her under these circumstances was in his opinion "utterly impossible."

We do not express a final view now on how these factors are to be evaluated. But the facts should be developed and then evaluated in the light of the proper legal standard. Henderson v. Flemming, 5 Cir., 1960, 283 F.2d 882, at page 884; United States v. Williamson, 5 Cir., 1958, 255 F.2d 512, at page 515; Mitchell v. Raines, 5 Cir., 1956, 238 F.2d 186, at page 187; Galena Oaks Co. v. Scofield, 5 Cir., 1954, 218 F.2d 217, at page 219. The result is that the case must be remanded for a further trial on these crucial matters occurring after the Noah's Ark slipped off the sand dredge. Established by the Trial Court's findings and action by us are two things requiring no further inquiry: (1) valuable salvage services were rendered by the Cudjoe to the Noah's Ark; and (2) the salvor was guilty of negligence for which it is legally responsible in casting off the Noah's Ark without warning. The amount of the salvage award, the extent to which it should be diminished if at all, the extent and nature of damage sustained by the Noah's Ark for which the salvor is legally responsible under the applicable standards are all matters which are for a new trial and determination by the Court. Each may bear upon the other. Thus in determining the value of the salved vessel the portion vicariously restored to her value through a decree for damages may be relevant. Similarly, the amount, nature and extent of damages sustained may affect the problem of diminution or forfeiture of an award and the allowance of affirmative relief. Without undertaking to blueprint the trial or to intrude upon the considered discretion of the District Court in determining in the first instance the extent to which, or what, evidence is to be received, we would make clear that the entire present record is available for use on remand without the necessity of reproducing the witnesses or retaking depositions.

For a retrial and other consistent proceedings, the case must be reversed and remanded.

Reversed and remanded.