**UNITED STATES of America,**
**Appellant,**

v.

**Jumelia M. DeVANE, as Administratrix**
**of the Estate of James Frank DeVane,**
**deceased, Appellee.**

**No. 19300.**

United States Court of Appeals
Fifth Circuit.

Aug. 15, 1962.

Alan S. Rosenthal, David L. Rose, Sherman L. Cohn, Attys., Dept. of

Justice, Washington, D. C., Clinton Ashmore, U. S. Atty., Tallahassee, Fla., for appellant.

Nathan Bedell, Jacksonville, Fla., for appellee.

Before TUTTLE, Chief Judge, BELL, Circuit Judge, and SIMPSON, District Judge.

GRIFFIN B. BELL, Circuit Judge.

This appeal is from a judgment entered against the government on a suit brought under the Federal Tort Claims Act [1] and the Death on the High Seas Act [2] to recover for the death of the captain of a fishing vessel, the Virginia May, which sunk in a storm off the west coast of Florida. The captain, James Frank DeVane, died five days thereafter while on a life raft.

As in United States v. Gavagan, 5 Cir., 1960, 280 F.2d 319, Cert.Den., 364 U.S. 933, 81 S.Ct. 379, 5 L.Ed.2d 365, we are concerned with death allegedly resulting from the manner in which the unsuccessful rescue of the Virginia May and her crew was handled by the Coast Guard operating under the National Search and Rescue Plan.[3] The crew consisted of Captain DeVane and one helper, Alton Turner, who was saved by the Coast Guard.

Captain DeVane, a 48 year old resident of Steinhatchee, Florida owned the Virginia May, a fifty foot flat bottomed fishing vessel which he used for party and commercial fishing. On Monday, October 13, 1958, he and his helper departed Steinhatchee to fish the Florida Middle Ground, in the Gulf of Mexico, at a distance of approximately sixty five miles on a bearing of 215° from Steinhatchee, telling his wife that he would return on Friday or Saturday. They arrived at the Middle Ground on Tuesday and commenced fishing. On Friday, October 17, Captain DeVane talked with Captain Harrell of the Amberjack, who was then in port at St. Petersburg, reporting that he was fishing in the center of the Middle Ground, that the weather was rough, and that he planned to move to the east side of the Middle Ground to fish through Saturday if the weather

1. The Federal Tort Claims Act provides in pertinent part:

28 U.S.C.A. § 1346(b)

"Subject to the provisions of chapter 171 of this title, the district courts * * * shall have exclusive jurisdiction of civil actions on claims against the United States * * * for * * * personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government * * * under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

*      *      *      *      *

"§ 2674. Liability of United States

"The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages."

2. The Death on the High Seas Act, 46 U.S.C.A. 761 et seq., provides in pertinent part:

"§ 761. Whenever the death of a person shall be caused by wrongful act, neglect, or default occurring on the high seas beyond a marine league from the shore of any State, or the District of Columbia, or the Territories or dependencies of the United States, the personal representative of the decedent may maintain a suit for damages in the district courts of the United States, in admiralty, for the exclusive benefit of the decedent's wife, husband, parent, child, * * * or corporation which would have been liable if death had not ensued.

*      *      *      *      *

"§ 766. In suits under this chapter the fact that the decedent has been guilty of contributory negligence shall not bar recovery, but the court shall take into consideration the degree of negligence attributable to the decedent and reduce the recovery accordingly."

3. This plan designated as SAR was promulgated in 1956 by the President's Air Coordinating Committee and is described in detail in Gavagan, supra, pp. 322-323. The Coast Guard was authorized to render aid to the distressed vessel under Title 14 U.S.C.A. § 88(a) (1).

faded, and would arrive home on Sunday, October 19.

On Saturday, October 18, the Virginia May fished alongside the Augustine where Captain DeVane discussed weather conditions with her captain and the fact that the barometer was erratic. Captain DeVane left the Augustine about one o'clock P.M. on a course for Steinhatchee, saying that he was going to return to port but would fish some on the way in order to finish out his catch. Captain DeVane was also in communication with the Georgia May that afternoon, reporting that he was fishing on the seventeen fathom curve in the Middle Ground.

Turner testified that they fished occasionally between one and five o'clock but headed generally toward Steinhatchee. They finished their fishing and continued on that course for about two hours until darkness came and they began to encounter heavy seas and high winds. The vessel was turned into the sea, the forward hatch cover was blown off as was the canvas top over the stern of the vessel. The motor was swamped at approximately ten o'clock P.M. and efforts to call for help on the radio failed.

Captain DeVane and Turner took to a life raft after placing flares, food and water in it, and the Virginia May went down. They failed to lash the supplies to the raft and it was immediately swamped by waves and the supplies lost, although they were able to stay with it. They were then adrift in the raft and exposed to the elements without food or water. Captain DeVane drank salt water from time to time but the evidence is disputed as to the amount. Turner sipped salt water. On Tuesday or Wednesday, Turner caught a fish with his hands and they ate it. Captain DeVane died just before the light of day on Thursday, October 23. That afternoon the raft was sighted by a search plane which directed a near-by fishing vessel to rescue Turner and remove Captain DeVane's body.

Meanwhile, upon the failure of Captain DeVane to return by Sunday morning, October 19, and being aware of the storm, Mrs. DeVane reported the Virginia May overdue by telephoning the Coast Guard station at St. Petersburg. She gave full information with respect to the vessel, where it had been fishing and stated that she had several persons standing by to go out if the Coast Guard spotted the vessel.

The Coast Guard Air Station at St. Petersburg is a SAR agency. The area of the Gulf in question is the responsibility of the seventh Coast Guard District in Miami. Immediately prior to receiving the information from Mrs. DeVane, an incident involving another vessel, the Lady Lou, had been reported. She was disabled at a location about sixty miles south and east of the last reported position of the Virginia May. A Coast Guard vessel was directed to proceed to the Lady Lou and to search for the Virginia May while enroute. The Coast Guard also immediately commenced a communications check in line with established procedure which involved calling all ports in the area inquiring as to the whereabouts of the Virginia May, to no avail. Attempts by the Coast Guard radio station to reach her by radio also were unsuccessful. Broadcasts were made hourly alerting all ships that the Virginia May was overdue with two persons on board.

At 1:36 P.M. on Sunday, the officer in charge at St. Petersburg, advised the Coast Guard District in Miami that the communications check had been completed with negative results. Normally the next step would have been to dispatch aircraft or vessels or both to search for the Virginia May but the Lady Lou reported that she was in need of immediate assistance and as a result of the efforts of the Coast Guard to assist her, the search for the Virginia May did not begin until 4:50 P.M. at which time the P5M, an aircraft was diverted to search the area where the Virginia May was last seen, and this continued until dark with no success. At 7:25 P.M. the Coast Guard Cutter Nemesis reported to the Coast Guard radio station at St. Peters-

burg that it had been in radio contact with the fishing vessel Georgia May and received a report of the communication between the Virginia May and the Georgia May on Saturday afternoon, and that the Georgia May would try to contact the Virginia May the next morning and one or the other would contact the Coast Guard. Based upon this information, the scheduled air search for the following morning, Monday, was discontinued pending the radio report.

A fateful error occurred on Monday morning resulting in the mistaken assumption that the Virginia May had been located and was in no distress. Captain Harrell of the Amberjack, having read in the newspaper that the Virginia May was overdue, reported to the Coast Guard by telephone that he had been in contact with the Virginia May on Friday and that the Virginia May planned to fish the eastern side of the Middle Ground all day Saturday and start back Sunday and should have made it by Sunday night. The Coast Guard then tried without success to call the Virginia May. As a result of some inexplicable error in the Coast Guard communication center in St. Petersburg, and this is not disputed, the message from the Amberjack was mistakenly interpreted to mean that the Amberjack had been in contact with the Virginia May on Monday morning, October 20, instead of Friday, October 17, and the search for the Virginia May was cancelled by the Coast Guard. Mrs. DeVane was then advised on that day that her husband was safe.

Within an hour after the Amberjack message had been received, Captain Hembvree, a boat operator friend of Captain DeVane, called the Coast Guard station in St. Petersburg to inquire of the plight of the Virginia May and was informed that she was safe and planned to fish a few more days. He testified that Captain DeVane once saved his life and that had he known the Virginia May was still overdue, and that the Coast Guard was not making an all out effort to find her, he would have searched for her and could have reached Middle Ground area within seven or eight hours.

On Tuesday morning, October 21, Warrant Officer Sellers came on duty at the Coast Guard radio station in St. Petersburg and, following his usual practice, checked over the radio log for the previous day. He immediately saw from the original messages and from their transcription a strong possibility of serious misinterpretation, and that it could well be that the Virginia May was not actually safe as reported. He compared the entry in the radio log with the messages sent to the District, ascertained the error and advised the Coast Guard District. At 9:35 A.M. the P5M was diverted from a training flight to recommence the search. The results for that day were negative. Additional search aircraft from other commands unsuccessfully searched over a wide area on Wednesday, October 22, and on the next afternoon at 4:00 P.M. the life raft was located at a position about thirty two miles south of its reported position when last seen.

It is undisputed that approximately twelve hours of search time was lost on Monday due to the error in the Coast Guard message center, and that the search thereafter was conducted in the best tradition of those services participating in it. The District Court found that the negligence of the Coast Guard in handling the messages resulted in the cancellation of the search at a crucial time, and concluded that the negligence proximately caused the death of Captain DeVane.

The government contends that the District Court erred in refusing to equate its position in rescue operations to that of a private person in like circumstances as is required by the Tort Claims Act, and thereby in imposing liability because of negligence which in no way worsened the position of decedent within the meaning of the Good Samaritan doctrine. It is also contended that the District Court erred in refusing to reduce the amount of the recovery in accordance with the degree of negligence attrib-

utable to the decedent as is required by § 766 of the Death on the High Seas Act, supra.

The District Court failed to make a finding with regard to whether the negligence of the Coast Guard in cancelling the search worsened the position of Captain DeVane. The government takes the position that such a finding was necessary, and that there was no evidence of worsening. Appellee takes the position that such a finding was not necessary but, in any event, there was sufficient evidence of worsening. We put aside the question of proximate cause since the finding of the District Court in that regard is not challenged.

■ The worsening question arises under the Good Samaritan doctrine which provides that the negligence of the volunteer rescuer must worsen the position of the person in distress before liability will be imposed. United States v. Gavagan, supra, United States v. Lawter, 5 Cir., 1955, 219 F.2d 559; Restatement, Torts, §§ 323, 324; 38 Am. Jur. Negligence, § 17, p. 659. And the Tort Claims Act by its specific terms equates the liability of the government to that of a private person. §§ 1346(b) and 2674, Footnote 1, supra. See also, Indian Towing Co. v. United States, 1955, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48; and Rayonier, Inc. v. United States, 1957, 352 U.S. 315, 319, 77 S.Ct. 374, 1 L.Ed.2d 354.

The failure of the District Court to make a finding as to worsening of position under the Good Samaritan doctrine, and the variance of the position of the parties here stems from their different interpretations of Gavagan. The District Court construed it to mean, and appellee supports that position here, that

the government has an affirmative responsibility under the National Search and Rescue Plan to rescue those in peril at sea and therefore any worsening of position would not be a consideration in determining liability for negligence arising therefrom.

■ The position of the government, with which we agree, is that Gavagan went no further than affirming what is clear from the statutes—that the decision to undertake or abandon a rescue is discretionary with the Coast Guard and the other government agencies who participate in the National SAR plan. But having undertaken the rescue and engendered reliance thereon, the obligation arose to use reasonable care in carrying out the rescue. And negligence in the operation would create liability if it was the proximate cause of loss or damage where the position of one was worsened in reliance on the undertaking by the Coast Guard. It turned, as does this case, on the teaching of Indian Towing Company v. United States, supra, that:

"The Coast Guard need not undertake the lighthouse service. But once it exercised its discretion to operate a light on Chandeleur Island and engendered reliance on the guidance afforded by the light, it was obligated to use due care to make certain that the light was kept in good working order; * *."

Gavagan went on to hold that the facts fully met the worsening of position requirement of the Good Samaritan doctrine, thus giving that doctrine full effect. And it is singular that the negligence there, as here, occurred after the rescue was undertaken through a breakdown in message transmission.[4]

4. Gavagan did reject the position of the government based on the concept that a salvor may abandon his efforts at any moment prior to the time he takes the property in his charge without liability where there is no "independent" or "distinguishable" damage. This type damage is described as a type sustained by the salvaged vessel other than that which she would have suffered had not the salvage efforts been undertaken. It is harm distinct from that from which the vessel is being saved. The Noak's Ark v. Bentley & Felton Corp., 5 Cir., 1961, 292 F.2d 437, 441. The discussion in Gavagan regarding the policy of the government to engage in search and rescue projects was in large measure in response to this salvor concept contention.

■ The contention of the government that there was no evidence upon which a finding of worsening of position could be based is without merit. We will not detail the evidence in this regard since it is a matter for the District Court. Suffice it to say that there is not such absence of evidence on the question as would warrant us to reverse and render judgment for appellant.

■■ The other assignment of error is based on the failure of the District Court to take into account the negligence of decedent and reduce the recovery accordingly as is required by the statute, supra. The District Court, relying on Gavagan, considered and disregarded the asserted negligence of Captain DeVane in failing to properly equip his vessel, in failing to heed the warnings of adverse weather, and in failing to lash the supplies and flares to the life raft as not constituting proximate cause. We affirm this ruling on the basis that this negligence was prior to the negligence of the Coast Guard. Comparative negligence relates to that negligence which is the proximate concurring cause of the injury. The court here found the proximate cause to be the negligence of the Coast Guard in cancelling the search after the misconstruction of the message. It was a supervening cause, occurring after the prior negligence of Captain DeVane. Whatever may have been his negligence, the fault of the government was in thereafter worsening his position.

> "Where two distinct causes, unrelated in operation, contribute to an injury, one of them being a direct cause and the other merely furnishing the condition or giving rise to the occasion by which the injury was made possible, the former will alone be regarded as responsible for the result." 86 C.J.S. Torts § 30.

It is not clear just what consideration the court gave to the assertion that the drinking of salt water by Captain DeVane was negligence to be considered in assessing damages. The credibility of witness Turner was in issue and the court should have made a finding as to whether or not Captain DeVane did in fact negligently consume excessive quantities of salt water, and if so, whether such negligent consumption was a proximate cause of his death to be taken into consideration in the award of damages. Title 46 U.S.C.A. § 761.

The District Court may, in its discretion, make the findings required hereunder on the present record, or upon the present record and additional evidence, or after a new trial. Rule 59(a), Fed R.Civ.P., 28 U.S.C.A. Cf. Aetna Insurance Company v. Paddock, 5 Cir., 1962, 301 F.2d 807.

Reversed and remanded for further proceedings not inconsistent herewith.

SIMPSON, District Judge (concurring in the result).

I reach a different view than the majority as to the holding of this Court in United States v. Gavagan, 280 F.2d 319. I understand the opinion here to hold that Gavagan adopts the Good Samaritan doctrine as the standard required to establish liability of the government, and that hence a finding of "worsening" as an indispensable element of that doctrine is required to support a finding of liability.

I do not understand the Gavagan holding as adopting the Good Samaritan doctrine. Rather, at page 328, after adopting a standard of reasonable care, and saying "In this respect it is virtually the same as Indian Towing," and quoting from that case, 350 U.S. 61, at page 69, 76 S.Ct. 122, at page 328, the opinion continues:

> "*In addition* we are also of the opinion that the facts fully meet the requirements of the Good Samaritan doctrine," (emphasis supplied)

and points out why including the evidence in the record as to "worsening".

Judge Brown is thus saying for the Court, not that Good Samaritan *is* the standard, but only that *even if it is* the standard (as contended by government counsel, both there and here) the evidence in Gavagan meets that test.

The net effect of the majority opinion seems to me therefore, to be to overrule, rather than to follow Gavagan. With deference to the majority view, I think we should be bound by its precedent.

I agree fully with the majority that the case should be returned to the District Court for further findings with respect to contributory negligence. For this reason, I concur in the result.