**John B. HOHENSTEIN, Jr., d/b/a Hohenstein Shipping Company, Appellant,**

v.

**S. M. H. TRADING CORPORATION,**
**Appellee.**

**No. 24041.**

United States Court of Appeals
Fifth Circuit.

July 31, 1967.

George H. Chamlee, Lawrence J. Dwyer, Savannah, Ga., for appellant.

Daniel L. Stonebridge, New York City, Albert A. Sadler, Savannah, Ga., for appellee.

Before BROWN, Chief Judge, SIMPSON, Circuit Judge, and SUTTLE, District Judge.

JOHN R. BROWN, Chief Judge:

To the libel of the Shipper,[1] claiming breach of a stevedoring contract to load 5704 net tons of cast iron pipe at Savannah, Georgia, for delivery to Puerto Rico, the Stevedore[2] was held liable for failing to load 1300 short tons, approximately 28% of the cargo list.

Since it is uncontradicted that the Stevedore efficiently stowed the cargo and the cargo shut-out was due to insufficient cubic capacity of the ocean-going barge, the Stevedore urges that it is, in effect, being held liable as a guarantor of the capacity of the tendered vessel. Because that undertaking is nowhere to be found in the letter-memorandum-contract, it is evident that the trial Court in disregard of the parol evidence rule imported into the writing the previous express, oral representation by the Stevedore that the vessel could carry the proposed cargo. As so often, there is virtually no disagreement between the parties as to controlling principles of law. Neither challenges the validity or significance of the parol evidence rule. The Stevedore claims a violation of it because the trial judge relied on the implied promise arising from the prior oral misrepresentation, the Shipper contending, on the other hand, that by construction of the written contract, not the prior oral implied promise, the commitment to load the full cargo is clearly undertaken.

After a trial in which the Judge heard a number of witnesses, a decree was entered in favor of the Shipper fixing its damages as the amount paid an ocean liner service for transportation of the shut-out cargo plus some railroad demur-rage claims.[3] At the same time, on the asserted basis that there was no evidence to support it, the Court dismissed the Stevedore's cross libel for the balance of the sums due it under the contract for authorized expenses and loading of the cargo.[4] On the basic liability we affirm, but modify as to certain items of damages.

 The decisive legal principle is frequently but simply stated in a variety of ways. Thus in Gulf, C. & S. F. Ry. Co. v. Coca-Cola Bottling Co., 5 Cir., 1966, 363 F.2d 465, 467, this Court had this to say.

"The contract is before us and it is our duty to interpret its meaning without any presumption in favor of the interpretation given it or the legal conclusions reached by the trial court. * * * Its meaning presents a question of law. But in considering the contract, we cannot interpret it, or determine its true meaning in a vacuum with complete disregard of pertinent facts and surrounding circumstances out of which this litigation arose. * * * *"

"In reaching our decision in this case we are within the bounds of sound legal principles and fundamental rules of contract construction if we look not only to the actual wording of the contract, but also give consideration to its subject matter, the facts relating to the controversy in issue and the surrounding circumstances, in order to determine the intention of the parties as reflected by the words used."

This echoed our previous statements in Fidelity-Phenix Fire Insurance Co. v.

1. S.M.H. Trading Corporation of New York City. One of its principal activities was the sale of merchandise including steel products to purchasers outside the United States.

2. Hohenstein Shipping Company. Its letterhead describes it as Steamship Agents —Stevedores.

3. Ocean liner freight $28,736.53
Railroad Car Demurrage 1,544.00

4. Stevedoring charge per ton loaded
(Under deck and on deck) $13,685.49
Expenses for Shipper's account 13,935.41
$27,620.90
Less Advance 14,260.00
Unpaid balance $13,360.90

Farm Air Service, Inc., 5th Cir. 1958, 255 F.2d 658, 660. "A court called upon to determine the meaning of written contracts such as those here involved looks primarily to the language of the contracts after first placing itself as nearly as possible in the position of the parties to them at the time of their execution. * * * The situation of the parties was developed by the evidence without objection and virtually without dispute." And in American Oil Company v. Hart, 5 Cir., 1966, 356 F.2d 657, we phrased it this fashion. "Amoco's argument attacking the denial of the third-party impleader judgment against the independent contractor is a simple one. * * * It insists that the words of the indemnity clause * * * being substantially identical, compel an identical result. And so it would, were contract construction simply a question of simple words. But any such approach ignores the well accepted, but frequently ignored, principle that the words employed are read in the setting of the parties." See especially cases cited 356 F.2d at 659, n. 6. And most recently we reiterated it in these terms. "For natural reasons, Motor Casualty urges strict literalness here. * * * But when it is borne in mind that under basic principles of contract construction, the meaning and application of plain words used is to be judged in the situation in which the parties were placed at the time of making the agreement, it is clearly evident that literalism would here produce a result that makes no or little sense." Motor Vehicle Cas. Co. v. Altantic National Ins. Co., 5 Cir., 1967, 374 F.2d 601, 604–605 [Mar. 14, 1967]. And as a corollary to this, we have also held that in determining what this setting is the Court may receive for that limited purpose correspondence showing the dealings between the parties, the negotiations and the like, not to alter or vary the terms of the written memorial, but to portray the setting. United States Industries, Inc. v. Camco, Inc., 5 Cir., 1960, 277 F.2d 292, 295–296, n. 14.

This was the setting of the parties. The Shipper, with its office in New York City, was engaged apparently in the sale of merchandise, especially to purchasers out of the United States. In April 1964 it became interested in arranging for the shipment of a quantity of cast iron pipe originating in Birmingham, Alabama, and Lynchburg, Virginia, to a purchaser in San Juan, Puerto Rico, through the Port of Savannah. Under the Shipper's trade, the sale was FOB San Juan, P. R., so the obligation to supply ocean transportation was on it. About April 16 there was a telephone informal rate quotation but no firm agreement could be made since the amount of cargo to be shipped was unsettled, and the Shipper had not yet selected (or chartered) the carrying vessel. After further exchanges, the Shipper on April 24 by letter sent the Stevedore a "capacity plan [5] of the barge we are dealing with" and a list of the pipe to be shipped.[6]

The Barge ultimately chartered was the MARGARET SHERIDAN, a sister ship. The Shipper, through testimony

5. This was for the unmanned ocean-going Barge T. J. SHERIDAN FREEMAN, a former Pocahontas coal carrier. The Plan indicated dead weight capacity (5500 gross tons), had a scale, gave overall lenghth, beam, and depth dimensions from which gross size of hatches and holds could be calculated. It indicated the cubic capacity of the holds as follows:
"Taken to tank top, to under side of beams, to under side of trunk top and hatch covers, to shell, to ceiling on frame brackets.
Net capacities at 43 cu. ft. per ton

| | | | | |
|------------|-----------|---------|------|------|
| Hold No. 1 | 58652 | cu. ft. | 1364 | tons |
| Hold No. 2 | 57344 | cu. ft. | 1334 | tons |
| Hold No. 3 | 60168 | cu. ft. | 1399 | tons |
| Hold No. 4 | 56432 | cu. ft. | 1312 | tons |
| Total | 232596 | cu. ft. | 5409 | tons" |

6. The cargo list broken down as to quantity (in terms of feet), diameter, weight per foot, total pounds and net tons totaled 5,003.90 net tons.

of an acknowledged competent marine architect with detailed supporting report established the cubic of the sister ship to be 243,184 cubic feet subject to a plus or minus 2½% error (6500 cubic feet) thus bearing out the Shipper's testimony that the MARGARET SHERIDAN was "just a little bigger as far as capacity was concerned." This letter specifically requested the Stevedore to give Shipper telephone advices as to a proposed cargo plan and, most important, whether "the barge has for sure the capacity to take the material involved." It is now uncontradicted that in the return telephone conversation a responsible informed executive of the Stevedore categorically advised the Shipper that the full cargo could be stowed on the vessel. Although the making of this unqualified statement is not disputed, it was never reduced to writing.

There were further discussions by telephone with confirmatory letter exchanges. By May 15 the Stevedore was advised that the Barge would now be the MARGARET SHERIDAN and that, contrary to earlier plans for cargo working and stowage, the Stevedore was informed that the condition of the deck area of the Barge would not permit the use of portable cranes on deck. Not later than May 19 in telephone conversations the Stevedore was informed that the amount of pipe for shipment had been increased to 5,704 net tons. This was confirmed by the Shipper's letter of May 20.[7]

This brings us to the crucial date, time and event of the letter-memorandum-contract dated May 20 from Stevedore to Shipper accepted by Shipper (with immaterial modifications) May 27, 1964.[8]

---

7. In the Shipper's letter of May 20 describing 5,704 net tons to be shipped, it stated: "We have chartered the Barge "MARGARET SHERIDAN" for a total capacity of 244,000 cubic feet bulk under deck, and 5,500 l/t D.W. * * * available for cargo. * * *."

8. For ease of reference we have inserted identifying letters in brackets, e. g., [A], [B]:

"May 20, 1964

"S.M.H. Trading Corporation
 * * *
 [A] "MARGARET SHERIDAN"
 Loading 5704-Short Tons
 CAST IRON PIPE
 Savannah/Puerto Rico on
 or about June 1/3, 1964.
"Gentlemen:
 [B] This will confirm our telephone discussion of yesterday in which you advised that the referred vessel has been fixed firm to lift the above mentioned cargo from Savannah, with lay days of June 1st to June 8th, and probably actual loading dates of June 2/3.
 [C] In order that all concerned have a clearly detailed statement of the facts attendant to this loading operation, we reiterate below all the pertinent details covered by previous discussions and exchanges of correspondence:
 [D] CARGO PARTICULARS:
 Ex: Birmingham, Ala.

| Quantity | Size | Net Tons | Maximum Lengths |
|---|---|---|---|
| 25,000′ | 2″ | 77.50 | 20′ |
| 213,000′ | 4″ | 1682.70 | 20′ |
| 80,000′ | 6″ | 1004.00 | 18′ |
| 20,000′ | 6″ | 280.00 | 18′ |
| 40,000′ | 8″ | 674.00 | 18′ |
| 5,022′ | 8″ | 101.00 | 18′ |
| 30,000′ | 12″ | 862.50 | 18′ |
| Ex: Lynchburg, Va. | | | |
| 19,000′ | 16″ | 1022.20 | 18′ |
| TOTAL—NET TONS | | 5703.90 | |

The story nears its climax—the end of the story and the beginning of the controversy. The cargo was called forward for loading on the Barge as planned. Upon the arrival of the Barge and almost immediately after commencement of operations, the superintending stevedore on behalf of the Stevedore recognized that the vessel could not possibly load the full scheduled cargo. The Stevedore gave immediate notice, surveyors were soon on the scene, but with the most efficient planning and execution 1300 net tons were shut out after loading on deck approximately 400 tons.[9]

Before discussing the underlying and more difficult question of contract interpretation versus impermissible parol evidence variation, a few insubstantial contentions should be put to one side. On the trial the Stevedore tried to make much of two things. The first was the fact that the capacity plan was not only for another vessel but it revealed bulk cubic only, not bale cubic. Second, representation of capacity concerned 5,000, not 5704, tons. Granted that baled cubic, not bulk cubic, is needed for an accurate determination, when the Stevedore's superintendent came on the dock it took

DELIVERY PARTICULARS:

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

COORDINATION OF DELIVERY:

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

[E] WORK PROGRAM:

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

As previously advised, we had hoped to be able to complete loading within the required three (3) day time limit plus a small amount of overtime. With the increase in total tonnage, however, it may be necessary to work more overtime than originally contemplated but every effort will be exercised to confine the loading operation to the specified time period.

STEVEDORING RATE:

Rate—$3.50 per 2240-lbs. (\*)

\* Includes clerking and rental of gantry cranes. Necessary dunnage to be billed at cost for your account. Any overtime will be a standard time and one-half rate and will be for your account. No overtime will be worked without prior authorization from you.

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

PREPARATION OF DOCUMENTS:

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

[F] DISBURSEMENTS AND ADVANCE FUNDS:

We will expect to be placed in funds in the amount of $17,500.00 prior to the loading operation of the vessel. This advance payment is based on the following anticipated expenses:

80% of total stevedoring and excess crane hire
(1) Port charges—approximately $1,000.00
(2) \* Wharfage 2,280.00

\* NOTE: If wharfage is to be paid directly by you to Savannah State Docks the over-all disbursement advance could be reduced to $15,500.00.

[G] This correspondence is provided in duplicate and you will note that a space is provided thereon for your signature, signifying agreement to and acceptance of all terms and conditions outlined herein. Said signature and return to us of the duplicate copy of this correspondence shall be considered a duly executed contract between S.M.H. Trading Corporation and Hohenstein Shipping Company in the capacity of stevedores and, in which capacity we certify that every effort will be exercised to faithfully execute our responsibility to provide you with the best possible operation at the lowest possible cost.

Thank you for this opportunity to be of service to you."

9. No one had planned for on deck stowage. Included in the crosslibel (see note 4 supra) were charges for shoring gangs ($4,364.39) and shoring equipment ($4,222.-50).

him only a few minutes to realize the worst. And on the trial, one of its prized experts acknowledged that within ten minutes time he could have determined from inspection of the plan that the vessel was incapable of loading this cargo list as proposed. Additionally, there was no substantial difference either in bulk cubic capacity or dimensional characteristics as between the two Barges. The difference in total tonnage was not regarded as significant since this evoked no comment from the Stevedore on learning of it in the telephone conversations. More important, before the charter of the MARGARET SHERIDAN was fixed, the Stevedore knew that the Shipper intended to lift 5704 tons on a sister ship whose capacity to carry the Stevedore had authoritatively represented in the initial advices.

It rounds out this picture to make these comments. Neither here nor below either as a matter of advocacy or evidential detail did the Stevedore undertake to explain how or why this critical mistake on capacity evaluation and representation took place. Rather, it candidly acknowledges that the mistake was made by a responsible executive. Likewise, it does not deny both that it was aware the information was of critical importance to the Shipper and that the Shipper would rely on it. This means, for all practical purposes, that were this not complicated by an integrated writing constituting "the" contract, there would be no doubt that this inquiry and response and reliance thereon would constitute a classic case analogous to "promissory estoppel".[10]

But this adds to our burden, not lightens it. For with the graphic inequities of complete nonliability, we must discipline ourselves against importing this oral, implied promise (see note 10

supra) into the writing. We agree with the Stevedore that if the obligation is to be found and enforced, it must be found in a fair reading of the written instrument. But we agree with the Shipper that even though in practical effect this amounts to a guaranty by the Stevedore of the capacity of the vessel this may plausibly be done against the background of the position the parties were in.

Several factors point in this direction from the face of the contract (note 8 supra). There is, first, the caption [A]. Ordinarily this would not be thought too significant. But this ties directly into the information received on May 19, the day before the Stevedore undertook to draft and forward the proposed contract. (See note 7 supra). In abbreviated shorthand form this restated the critical facts about (a) the amount of tonnage, (b) the name of the vessel, and (c) specific figures on cubic and deadweight capacity. But we need not depend on the caption carrying its own cryptic, but complete, message. For in the opening paragraph of the letter [B] several things are done. First, it expressly incorporates within the body of the writing the information received the day before. Next, and more important, it describes the project not as one of loading *as much of* the cargo as possible, but rather that the "referred vessel has been fixed firm to lift the above mentioned cargo from Savannah." And while it is the Stevedore's strong contention that the succeeding paragraph [C] has the purpose of excluding all prior negotiations and promises except as repeated expressly in the writing, the contract by its own terms undertakes to "reiterate below all the pertinent details covered by previous discussions and exchanges of correspondence * * *."

10. See 1A Corbin, Contracts, Ch. 8, Secs. 193–209 (1963); Restatement, Contracts, Sec. 90 (1932); and Travelers Indemn. Co. v. Holman, 5 Cir., 1964, 330 F.2d 142, 150–152, in which these concepts were rather fully developed.

The Restatement phrases it this way. "A promise which the promisor should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promisee and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise."

One of the most pertinent was, of course, the amount and characteristics of the cargo. This it proceeded to restate in the most minute detail in [D]. These "Cargo Particulars" gave all significant information including mill origin points, the quantity in linear feet, the diameter size, maximum lengths and weight in net tons. Again the aggregate totaled 5,-703.90 net tons, just a shade less than specified in the incorporated discussions of May 19, [B] and note 7 supra, and the caption of [A]. More than that, the writing had a built-in practical construction and reaffirmation of the intention of the parties with respect to the amount of the cargo the Stevedore was agreeing to load and stow. In [F] "disbursements and Advance Funds" the contract called for the advance payment of an amount equal to 80% of total stevedoring and excess crane hire (and certain port charges). In returning on May 27 the contract with its acceptance, the Shipper enclosed its check of $14,260 for the advance with the additional statement that "If an additional advance payment is needed for the purpose, please no not hesitate to contact us." The Stevedore's responsible officials in their testimony acknowledged that after converting net (short) tons to gross (long) tons to correspond with the basis for the contract "Stevedoring Rate" (note 8 supra) the advance payments amounted almost precisely to 80% of 5704 tons.

■ This leads us to the firm conclusion that a fair reading of the integrated contract reveals a commitment that the Stevedore could, and would, load all of 5704 tons of the specified cargo on the specified vessel.[11] It bears emphasis that this reading is one that the Stevedore agreed to actually load all (or substantially all) of the specified cargo. It is not a reading that the Stevedore was guaranteeing, as such, the capacity of the vessel even though in practical effect the contract put the risk of that

factor on the Stevedore. And our reading is neither weakened nor made impossible by the protective language in the concluding paragraph [G] and particularly the express emphasis that Hohenstein Shipping Company was contracting "in the capacity of stevedores * * *" and that it was in this "capacity we certify" that diligent efforts faithfully to perform the contract will be made. Whether a stevedore ought to be undertaking the risk of vessel capacity is a matter of business judgment, not one for Judges. But if—and we have resolved the if—the businessman-stevedore has taken on the risk by an agreement to load substantially all of the specified cargo list, then the commitment to load would surely be "in the capacity of stevedores." No help really comes therefore from this hoped-for exculpatory language.

The District Court's reading of the contract was therefore correct and on the facts an admitted substantial breach occurred for which the Shipper is entitled to damages.

■ But we agree with the Stevedore that adjustments are in order in the amount of damages to be awarded to the Shipper whether awarded directly or by way of credit or offset against the amounts due the Stevedore under the contract. These take the form of specific items of expense in the cross libel (see note 4 supra) and a credit for stevedoring charges on shut-out cargo.

### Contract Stevedoring Charges on Shut-out Cargo

The Stevedore rightly insists that if it is held to the contract as construed, the Shipper is entitled to be compensated but it is not entitled to be better off by virtue of the breach. Hence while there is a basis for awarding to the Shipper the cost of ocean liner freight for the movement of the shut-out cargo (see note 3 supra) this freight rate has a built-in charge for stevedoring in at

11. This reading would still permit the law's usual "substantial" performance test. But a 72% performance is hardly the equivalent of "substantially performed."

Savannah and out at Puerto Rico. If the Stevedore is to reimburse the Shipper for the cost of that incorporated stevedoring service, then the Stevedore ought to receive at the contract rate the amount the Shipper would have had to pay had the shut-out cargo been loaded on the chartered vessel.

The Shipper makes the faint suggestion that since the liner rate also had a built-in charge for discharging out at Puerto Rico, all of which port costs were for the account of the Shipper's purchaser, this amount would offset, in effect, the double loss imposed on the Stevedore by the trial court's denial of the amount which would have been earned. But this does not help the Stevedore nor is it necessary fully to compensate the Shipper. The Stevedore has to bear the discharge expense as a part of the Shipper's damage since it had to resort to liner service. But the Shipper ought not to be able both to recover the built-in loading costs and then escape liability for what would have been paid to the Stevedore on proper performance.[12]

### Expenses in Cross Libel

Besides actual stevedoring charges at the contract rate which obviously are allowable, the cross libel included items approximating $14,000 for authorized expenses.[13]

Shoring labor and material expense for deck load: There were two items (Nos. 11, 19) directly occasioned by deck loading of some of the cargo.[14] Since none of these items was incurred with express authority of the Shipper, no recovery is allowable. The contract did not contemplate, and no one can read into

it, a purpose to load any cargo on deck. These were charges incurred to extricate the Stevedore from its own predicament.

Some items are allowable although the record as to several of them is uncertain.[15]

Overtime: It is now uncontradicted (see note 15 supra) that the overtime (Items 2, 3, 4, 5, 6) was expressly approved so all of these except Item 6[16] are recoverable.

The Shipper insists that since loading took 6 days, rather than the 3 hoped for (See [E] in contract, note 8 supra) the overtime must have been due to the Stevedore's basic miscalculation of vessel capacity. This may be so, but it was not proved. To the contrary, the evidence from competent experts shows that the stevedoring was done efficiently and up to accepted standards of performance. The expectancy of three day loading so long as good faith was exercised was that and nothing more. It was certainly not an agreement for 3 lay days.

Stand by charges: Items 7, 9, 10, 17, 18 and related items 12, 13 for stand by during rain, gangway shifting and the like cannot seriously be questioned and are, except as indicated above (note 14 supra) allowable. Crane charges: Items 14, 15, 16 are essentially for portable crane hire differential for which the contract expressly made the Shipper responsible.

Port Authority Stevedoring charge: Item 20 is the 10 cents per ton charge assessed by the Savannah State Docks. Ordinarily this would be allowable but we think the exceptions noted on the

---

12. On the uncontradicted facts the Stevedore is to recover $3956.93.

13. For convenience we use the item numbers in Stevedore's Disbursement Account (Ex. 12).

14. No. 11 shoring gangs $4364.39
 No. 19 shoring materials 4222.50
 _____
 $8586.89
 Disposition of these items likewise covers Item 8, standby expense due to extreme starboard list from deck loading op-

erations, as well as those portions of items 7, 11, 12, 13, 15 and 16 relating to deck loading, work on June 7, the starboard list, labor, crane hire, overtime, etc.

15. By informal post-submission conference with counsel, supplemental memoranda were received which narrows the factual uncertainties.

16. This pertains to the last day (June 7) when deck loading was the principal activity. As with shorings, etc. this is not recoverable. (see note 14 supra).

Shipper's acceptance of May 27 excluded this. The Stevedore was put on notice that port charges were for the vessel's account.

We are mindful that arguments pro and con can be made about some of these damage adjustments, but as with The Noah's Ark v. Bentley & Felton Corp., 5 Cir., 1961, 292 F.2d 437, 1961 AMC 1641; 5 Cir. 1963, 322 F.2d 3, 9–10, 1964 AMC 59, it is good administration to bring it to an end here, not prolong it by a remand for further hearing.

Affirmed in part; reversed, modified and remanded in part.